THE STATE OF OHIO, APPELLEE, *v*. TAYLOR, APPELLANT.

[Cite as *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017.]

*Criminal law — Aggravated murder — Death penalty upheld, when — Waiver of counsel upheld — No right to hybrid representation.*

(No. 1999-0972 — Submitted October 15, 2002 — Decided December 20, 2002.)

APPEAL from the Court of Common Pleas of Greene County, No. 98-CR-54.

_____

ALICE ROBIE RESNICK, J.

{¶1} Appellant, James R. Taylor, was indicted by a grand jury on two counts of aggravated murder in the deaths of Ronald and Carolyn Rihm, one count of attempted aggravated murder relating to Pat Taylor, and one count of attempted murder relating to James Tipton. At trial, appellant was found guilty by a jury on all four counts and sentenced to death. Appellant directly appeals as a matter of right to this court, challenging his convictions and death sentence.

{¶2} Appellant has raised 14 propositions of law. We have reviewed each and have determined that none justifies reversal of appellant's convictions. We have also independently weighed the aggravating circumstances against the mitigating factors as delineated in R.C. 2929.04 and have reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's convictions and death sentence.

{¶3} On the evening of February 14, 1998, appellant waited for his estranged wife, Pat Taylor, to appear at the Fraternal Order of Eagles Lodge in Fairborn, Ohio. Pat arrived at the Eagles and sat at a table with Ronald and Carolyn Rihm, with whom she had been living since separating from appellant the previous month. When Pat refused to let appellant sit with her, appellant

produced a gun and fired shots toward Pat and both of the Rihms. While the shot towards Pat missed, Carolyn and Ronald Rihm were each shot in the head and died instantly. James Tipton, who was also seated at the table, was shot in the arm while attempting to subdue appellant.

## I. Facts and Case History

{¶4}  At the time of the crimes, appellant and Pat Taylor had been married for approximately 46 years. Pat left appellant on January 19, 1998, and moved in with friends Ron and Carolyn Rihm in their trailer home in Riverside. According to Pat, appellant resented her socializing with the Rihms and had argued with her about going out with them.

{¶5}  On January 21, 1998, appellant hired a private investigation company owned by Robert Beckett to locate Pat. Beckett found that Pat was living with the Rihms; appellant continued employing Beckett's investigation company through February 14.

{¶6}  Ron Rihm's mother, Lenore, saw appellant at church during January 1998. In an unsolicited comment, appellant told her, "It's Ronny's fault. Ronny's fault. It's all Ronny's fault."

{¶7}  Appellant leased rental cars through Enterprise Rent-A-Car on eight separate occasions from early January to mid-February 1998. Appellant told a friend, James Kovacs, that he was renting cars to locate his wife. He asked Kovacs to help him hide the rental car numbers with tape so that the cars would not be recognized.

{¶8}  Kovacs knew appellant through their mutual association with the Eagles in Fairborn. Kovacs had drinks with appellant several times at the Glass Crutch bar in the weeks leading up to the murders. Appellant told Kovacs in late January that he and his wife were splitting up, and appellant was "[v]ery upset" about it. Appellant talked about committing suicide "off and on." Taylor told Kovacs "quite a few times" that "if he caught [Pat] with anybody else, he'd kill

them both." Appellant also told Kovacs that he did not care for the fact that some people were taking care of his wife. "They were interfering with his wife and his marriage," Kovacs testified.

{¶9} On February 14, 1998, appellant phoned Beckett "half a dozen or more" times. Appellant wanted to send Pat flowers and wanted Beckett to phone her to see whether she would accept them; Beckett refused. During one of the calls, appellant told Beckett to follow Pat to see whether she was going to the Valentine's Day dance at the Eagles lodge that night. Beckett instructed one of his investigators, Ed Probst, to conduct surveillance on Pat. Late that afternoon, Probst began watching for Pat outside the Rihms' trailer.

{¶10} Meanwhile, appellant was meeting Kovacs at the Glass Crutch bar. Appellant clandestinely handed Kovacs, a Vietnam veteran familiar with firearms, two bullets and asked him what the differences were between them. Kovacs told appellant that the regular bullet would shoot straight into a body but that the hollow-point bullet "mushrooms, like explodes." When appellant asked whether it would "tear something up," Kovacs indicated that it would. Appellant also asked Kovacs whether he would phone the place where his wife was staying, but Kovacs declined to do so. The two chatted a little more, then appellant left the bar.

{¶11} Just after 7:00 p.m., Probst saw five people leave the Rihms' trailer in a van. He followed the van to the Eagles lodge. After the van had arrived at the Eagles, at approximately 7:40 p.m., Probst phoned Beckett, who advised him to wait outside the Eagles lodge "and see what happens." After talking with Probst, Beckett got a call from appellant, who asked him whether he had heard anything. Beckett told appellant that Pat had arrived at the Eagles, to which appellant replied, "I know that. I'm here." The phone then went dead.

{¶12} Bob West and his date, Sandy Spangler, rode with the Rihms and Pat to the Valentine's Day dance at the Eagles. James Tipton and his date

followed the group in a different car. Upon arriving at the social hall, the group gathered at a table in the corner of the hall where the Rihms usually sat. Joan Brest, a member of the Eagles, was at the lodge with her husband. She noticed appellant there and thought he "looked like he was mad at the world."

{¶13} Tipton, his date, and Pat sat on one side at the Rihms' table, Ron sat opposite Tipton, and Carolyn, West, and Spangler sat next to Ron. Appellant was sitting at a nearby table and requested that Ron ask Pat whether he could sit down with her. Pat replied, "Tell him not to start."

{¶14} Appellant stood up, went to the end of the Rihms' table, pulled a gun out of his pocket, and with his arm extended, fired the gun towards Pat. The shot missed Pat and hit a mirror on the wall. Appellant then turned to his right and shot Carolyn in the head. He then turned further to his right and shot Ron in the head. At no point during these three shots did anyone touch appellant.

{¶15} After the third shot, Tipton grabbed appellant's gun, and the two men struggled. As appellant tried to point the gun at Tipton's body, he fired a fourth shot. The shot broke bones in Tipton's upper arm. Several others in the hall joined in the struggle to subdue appellant, who at one point was struck on the head with a pool cue. Those subduing appellant finally got the gun away from him. Shortly thereafter, the Fairborn police arrived and handcuffed Taylor. Terry McVay, who had struck appellant with the pool cue, heard him say, "Go ahead and kill me. My life is over with anyway." Paula Mercer, who was helping Tipton, heard appellant ask "where his (expletive) gun was."

{¶16} Paramedics dispatched to the Eagles determined that both Ron and Carolyn Rihm were dead at the scene. Both died as a result of penetrating gunshot wounds to the head.

{¶17} The bullets recovered from the Rihms and from the wall in the Eagles lodge were hollow-point bullets. The gun recovered at the scene was a Davis Model P380, .380 caliber semi-automatic pistol, jammed by a cartridge

casing. Tests conducted on the gun indicated that the recovered bullets were fired from appellant's gun.

{¶18} After apprehending appellant, police took him to a hospital and advised him of his *Miranda* rights, which he acknowledged he understood. At the hospital, appellant made several unsolicited, spontaneous statements to a police officer: "This was all her fault. Why did she do this to me. Six hours at a Christmas dance was too long. She did me wrong." Appellant also said several times, unsolicited: "I just wish my wife would have just talked to me. I love that woman." While appellant was at the hospital, an atomic absorption test on his hands indicated the presence of gunshot residue.

{¶19} On February 20, 1998, a grand jury indicted appellant on two counts of aggravated murder alleging prior calculation and design. These counts had a death penalty specification, finding that the murder was committed as a course of conduct involving killing or attempting to kill two or more persons. See R.C. 2929.04(A)(5). Appellant was further charged with one count of attempted aggravated murder and one count of attempted murder. All four counts also carried firearm specifications.

{¶20} At several pretrial hearings, appellant indicated that he wanted his trial "started" and "over with." In addition, appellant declared that he wished to represent himself, because, otherwise, the court would not allow him to ask questions of witnesses during trial. After a competency hearing, the trial court found appellant competent to stand trial. Hearings were then held to determine whether appellant should be allowed to represent himself.

{¶21} The trial court refused to allow hybrid representation by appellant and counsel. Although defense counsel and the court advised appellant that it was not in his best interest to proceed pro se, appellant insisted that he had to question witnesses himself. Appellant signed a waiver of counsel in open court.

Thereafter, appellant entered a plea of not guilty by reason of insanity. The court appointed defense counsel, who served as backup counsel.

{¶22} At trial, a number of eyewitnesses to the murder were called by the state to testify, including appellant's estranged wife, Pat. Also testifying on behalf of the state was Michael Sexton, who was a fellow inmate of appellant's at the county jail. During several conversations with Sexton, appellant made a number of incriminating statements. Sexton testified that appellant had "wanted her shot in the vagina, stomach and breasts and in the head. And then he wanted the ring finger removed, shot off or cut off." Sexton further testified that appellant had wanted Sexton to recruit someone to kill his wife and had given him precise directions as to where his wife could be found. Instead, Sexton told one of the deputies in the jail what appellant had asked him to do.

{¶23} Appellant also told Sexton that "he hated" the Rihms and that "he felt that the couple" had caused the breakup of his marriage and had ruined his life. Sexton further testified that appellant had admitted using a .380 gun and hollow-point bullets and had stated: "It would get the job done." With regard to the murder victims, appellant told Sexton that he hopes "they burn in hell."

{¶24} During the state's case-in-chief, but away from the jury, the trial judge suggested to appellant that he allow counsel to represent him. Appellant, however, emphatically refused, stating, "There is a reason and you'll find out before the trial is over with where I'm going." Later in chambers, the state indicated it would be willing to enter into a plea agreement before Pat Taylor testified. Backup counsel advised appellant to accept the plea, but he refused. Appellant countered the state's offer by asserting that he would plead only to a charge of involuntary manslaughter. As a result, the parties were unable to reach an agreement.

{¶25} Appellant called a number of witnesses, including himself, and he subjected himself to cross-examination. In his testimony, appellant claimed that

he had gone to the Eagles dance in order to commit suicide in front of his wife. He went on to claim that the Rihms were best friends of his and that Ron Rihm had grabbed the gun and wrestled with him before he fired any shots. Appellant testified that he had panicked and did not remember the Rihms' getting shot. He also asserted that Tipton had lied on the stand about what had happened that evening. Appellant stated that before that night, he had received threatening phone calls, after which a black van had begun following him, and that is why he carried around a gun with hollow-point bullets. Nevertheless, he did concede that every time the private investigator had arrived to find the black van, it was not there.

**{¶26}** The jury found appellant guilty as charged.

**{¶27}** At the mitigation hearing, counsel represented the appellant, and both parties stipulated to the fact that appellant had no significant criminal history. Appellant gave an unsworn statement in which he chronicled his numerous complaints about his wife during their marriage. He also asked the jury to recommend death, "which is what I want. * * * I have nothing to look forward to in life but death itself."

**{¶28}** Dr. Jeffrey Smalldon, a forensic psychologist, testified at the mitigation hearing on appellant's behalf. He opined that appellant suffers from a paranoid personality disorder and that appellant is extremely fixated on unresolved problems stemming from his 46-year marriage.

**{¶29}** The jury recommended death, and the court imposed the death sentence. At the sentencing hearing, James Tipton gave a victim impact statement. During allocution, appellant claimed that Ron Rihm was a "hero" for saving his life by preventing him from committing suicide.

II. Pretrial Issues

A. Speedy Trial

**{¶30}** In his second proposition of law, appellant contends that the trial court denied his statutory and constitutional rights to a speedy trial. Appellant claims that he continually asserted his right to a speedy trial and that counsel lacked the ability to waive it for him since he had effectively discharged counsel and had elected to represent himself several months before the trial began.

**{¶31}** Under R.C. 2945.71(C)(2), the state is required to bring a defendant to trial on felony charges within 270 days of arrest. Each day that the defendant is held in jail in lieu of bail counts as three days in computing this time. R.C. 2945.71(E). The time may be tolled by certain events delineated in R.C. 2945.72(E) and (H), including continuances granted as a result of defense motions and any reasonable continuance granted other than upon the request of the accused.

**{¶32}** In addition, an accused is guaranteed the constitutional right to a speedy trial pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

**{¶33}** Appellant acknowledges that a defendant is bound by his counsel's waiver of speedy trial rights, even though the waiver might have been executed without his consent. *State v. McBreen* (1978), 54 Ohio St.2d 315, 8 O.O.3d 302, 376 N.E.2d 593, syllabus; however, appellant asserts that *McBreen* is distinguishable because he objected to the waiver filed by counsel and demanded that counsel be discharged. Appellant's arguments are not well taken.

**{¶34}** On February 24, 1998, ten days after his arrest for aggravated and attempted murder, appellant's trial was scheduled for April 20, 1998. In a judgment entry dated March 30, 1998, appellant signed a request to continue the trial to May 18. Then, in early May, defense counsel filed motions to suppress certain statements made by appellant as well as evidence obtained pursuant to a search warrant. Indicating that it would set a new trial date, the court scheduled the suppression hearing for August. At that point, appellant objected, stating that

he wanted his trial started and over with, and moved that his "lawyers be relieved from" representing him. When the court explained to appellant that such motions filed by his counsel are usual and expected, he maintained, "I don't need another counsel. I want to be my own counsel * * *. I'm asking you that the trial start May 18th." The trial court then rejected appellant's motion to dismiss counsel. In an order dated May 21, 1998, that analyzed the constitutional requirements regarding speedy trials, the court set the trial date for September 8. Then, on May 26, counsel wrote the trial court expressing concerns over appellant's competency to stand trial.

{¶35} On June 22 and July 2, 1998, the trial court held hearings on appellant's competency and motion to waive counsel. At a July 6 hearing, the trial court found appellant competent to stand trial. Then, at an August 17, 1998 hearing on waiver of counsel, appellant stated that he would agree to keep counsel if he could ask questions of witnesses along with counsel. After the trial court refused to allow hybrid representation, appellant executed a waiver of counsel and proceeded to represent himself. Subsequently, appellant either agreed to or moved for continuances extending the commencement of his trial to February 1999, when the trial actually began.

{¶36} Contrary to appellant's arguments, *McBreen*, 54 Ohio St.2d 315, 8 O.O.3d 302, 376 N.E.2d 593, is not distinguishable from the instant case. Under the *McBreen* syllabus, counsel could validly waive defendant's right to a speedy trial without his consent. Counsel continued to represent appellant until he waived his right to counsel at the August 17 hearing. Neither appellant nor defense counsel moved to dismiss charges against him on speedy trial grounds pursuant to R.C. 2945.73(B). Thus, the delay resulting from his counsel's request to continue the trial in order to consider motions filed on appellant's behalf should not be charged against the state for speedy trial purposes. Even assuming, arguendo, the legitimacy of appellant's argument that he was acting as his own

9

counsel beginning in May 1998, his motions to waive counsel and represent himself would have also tolled the running of the speedy trial statutes under R.C. 2945.72(E).

{¶37} Moreover, appellant's failure to file a motion to dismiss on speedy trial grounds prior to trial and pursuant to R.C. 2945.73(B) prevents him from raising the issue on appeal. See *State v. Thompson* (1994), 97 Ohio App.3d 183, 186-187, 646 N.E.2d 499.

{¶38} Furthermore, appellant's assertion of a violation of his constitutional rights to a speedy trial under both the United States and Ohio Constitutions is also without merit. In *Barker v. Wingo* (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101, the Supreme Court set forth a balancing test that considers the following factors to determine whether trial delays are reasonable under the Sixth and Fourteenth Amendments to the United States Constitution: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."

{¶39} The fact that appellant was brought to trial within a year of the murders can hardly allow the delay to be characterized as "presumptively prejudicial," a label that ordinarily triggers a constitutional speedy trial analysis and inquiry into the remaining *Barker* factors. *Doggett v. United States* (1992), 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520. Furthermore, in reviewing the four *Barker* factors, we conclude that appellant was not denied his constitutional right to a speedy trial. Though appellant had verbally asserted his right to a speedy trial early in the process, he never filed a motion to dismiss his case on speedy trial grounds and in fact successfully moved for a continuance later on. Nor does it appear that appellant was prejudiced by having his trial approximately one year after the murders. Therefore, we reject appellant's second proposition.

B. Failure to Appoint Substitute Counsel

{¶40} In his third proposition of law, appellant asserts that the trial court abused its discretion in failing to grant his request for substitute counsel. At the May 13 pretrial conference, appellant told the court, "I want to make a motion that my lawyers be relieved from me." Then, at the June 22 motion hearing, appellant reiterated, "I still want them dismissed, Your Honor. I still want them dismissed."

{¶41} However, appellant never requested substitute counsel, either by motion or orally. Rather, he asserted that he wanted counsel dismissed because he wanted to act pro se. Shortly after requesting that counsel "be relieved from" him, appellant told the trial court, "I don't need another counsel. I want to be my own counsel, Your Honor." At that point, appellant wanted to dismiss counsel because they had sought to continue the case to obtain hearings on motions; appellant wanted his trial "over with" and asserted, "I feel that I have the right to represent myself if I want to."

{¶42} Thereafter, the trial court held hearings on appellant's competence to stand trial and his motion for waiver of counsel. At the fourth hearing on his motion for waiver of counsel on August 17, 1998, appellant said that he did need legal help and that he would allow counsel to continue representing him, so long as they agreed to allow him to ask questions of witnesses. Appellant then declared, "[I]f I'm not allowed to examine those [witnesses], then I have to give up my right as far as counsel is concerned."

{¶43} Since appellant never requested substitute counsel, the trial court did not abuse its discretion in failing to appoint new counsel. The transcript clearly indicates that appellant wanted to act pro se. When he suggested that he might retain counsel, it was under the express condition that he would be allowed to ask questions of witnesses. Consequently, the trial court acted properly in refusing to allow hybrid representation, whereby appellant would have acted as "cocounsel" along with counsel. Neither the federal nor state Constitution

mandates a right to such representation.  See *State v. Thompson* (1987), 33 Ohio St.3d 1, 6, 514 N.E.2d 407, citing *McKaskle v. Wiggins* (1984), 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122.  See, also, *State v. Landrum* (1990), 53 Ohio St.3d 107, 119, 559 N.E.2d 710; *State v. Keenan* (1998), 81 Ohio St.3d 133, 138, 689 N.E.2d 929.  Accordingly, we reject appellant's third proposition.

### C.  Appellant's Self-Representation

{¶44}  In appellant's sixth proposition of law, he argues that the trial court erred by allowing him to represent himself at trial, since there is a real question as to whether he proceeded intelligently.  Appellant asserts that his self-representation actually aided the state in making its case against him and that his statements to the press and jury suggest that he engaged in a "state-supported suicide."  Appellant relies on *State v. Shank* (La.1982), 410 So.2d 232, in asserting that a death sentence is improper when a defendant represents himself in order to gain a sentence of death.

{¶45}  The Sixth and Fourteenth Amendments to the United States Constitution guarantee a state criminal defendant the constitutional right of self-representation when the defendant voluntarily, knowingly, and intelligently so elects.  *State v. Gibson* (1976), 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph one of the syllabus, citing *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562.  To establish an effective waiver of counsel, the trial court must determine whether the defendant fully understands and intelligently relinquishes his right to counsel.  *Gibson*, paragraph two of the syllabus.

{¶46}  As previously discussed, appellant first declared his desire to act as his own attorney at the May 13, 1998 hearing.  At that time, appellant was upset that defense counsel had filed several motions and had requested a continuance; appellant wanted his trial to be "over with."  The trial court then held no fewer than four hearings involving the issue of appellant's right to waive counsel and

represent himself pro se. During these hearings, appellant was repeatedly advised by defense counsel and the trial court that self-representation was not a wise decision, nor in his best interest. Even after the trial had begun, the court suggested to appellant that he allow counsel to represent him; however, appellant emphatically refused.

{¶47} Appellant asserts that his decision to represent himself was not "a good idea." We agree. The issue, however, is not whether appellant made a wise decision; rather, it is whether he "fully understands and intelligently relinquishes" his right to counsel. *Gibson*, 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph two of the syllabus. Appellant was warned several times that representing himself was a dangerous course to pursue, yet he persisted in self-representation.

{¶48} The trial court held a competency hearing to determine appellant's competence to stand trial. At that hearing, Dr. Jeffrey Smalldon opined that appellant was not capable of assisting counsel in his own defense. However, another psychologist, Dr. Susan Perry Dyer, testified that appellant was competent to stand trial, even though he was "likely personality disordered." Moreover, Dr. Dyer opined that appellant "is capable to work with defense counsel to mount a defense."

{¶49} At the July 22, 1998 hearing, the court discussed the law on self-representation and then interrogated appellant about his background, motivations, and desire to proceed without counsel. Appellant insisted that he wanted to cross-examine witnesses and testify, contrary to the advice of defense counsel. He paraphrased language from the Revised Code that the defendant has the right to cross-examine any witness, and claimed that he was being denied this right. He further told the court that he had once represented himself in a hearing at the Eagles lodge.

**{¶50}** Then, at the August 17, 1998 hearing, the trial court again questioned appellant about his desire to waive counsel and to represent himself. While appellant conceded the need for counsel, he said that he would agree to let counsel stay on only if counsel would allow him to ask questions of witnesses along with them. The court refused to allow hybrid representation. As noted in our discussion of appellant's third proposition, the United States and Ohio Constitutions do not provide for such an arrangement. See, e.g., *Thompson*, 33 Ohio St.3d at 6, 514 N.E.2d 407. The trial court did not err in refusing to allow hybrid representation. On the other hand, the right to self-representation is constitutionally mandated under *Faretta*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562.

**{¶51}** In any event, appellant insisted at the August 17 hearing that "there are some witnesses that I need to question myself." Appellant even acknowledged, "I'm probably making a bad decision doing this, but it's the only decision that I can make. * * * I'm being forced to do it because this is the only chance that I have got to try to prove things in here that has happened. * * * I'm giving up my life, if I don't do it, Your Honor." In this last declaration by appellant, it is clear that he is not giving up counsel in order to ensure that he would get the death penalty. The record reveals that appellant's situation and motivation for wanting to act pro se are distinguishable from those of the defendant in *Shank*.

**{¶52}** After the trial court reviewed each aspect of the waiver of counsel with appellant, he signed and dated the written waiver at the August 17 hearing. We find that the record amply demonstrates that appellant fully understood and voluntarily and knowingly relinquished his right to counsel. *Gibson*, 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph two of the syllabus. Thus, his waiver of counsel was valid.

14

**{¶53}** Ruling as appellant requests would undermine the constitutional guarantee to self-representation identified in *Faretta* that we followed in *Gibson*. The fact that appellant's decision to waive counsel and represent himself at trial was "not a good idea" is not the standard by which courts adjudicate this issue. Self-representation by a defendant is seldom "a good idea." Both the state and federal Constitutions, however, guarantee such a right to defendants with a valid waiver of counsel, regardless of the wisdom of such a decision. For these reasons, we reject appellant's sixth proposition.

### D. Appellant's Hearing Impairment

**{¶54}** In his fourth proposition of law, appellant contends that the trial court abused its discretion in failing to accommodate his hearing impairment. Appellant asserts that he was a 68-year-old man suffering from a hearing loss and that he had complained throughout the trial that he was unable to hear questions or statements by the court, the prosecutors, and witnesses. Based on the trial court's failure to accommodate his hearing impairment, appellant asserts that he was denied his right to confront witnesses under *State v. Schaim* (1992), 65 Ohio St.3d 51, 64, 600 N.E.2d 661.

**{¶55}** In spite of appellant's assertion, the record indicates that at no point did he either request an interpreter or any other accommodation for his impaired hearing, nor did appellant request a new trial or proffer expert testimony on his hearing impairment as the defendant did in *Schaim*.

**{¶56}** Moreover, the trial court went to great lengths to accommodate appellant's hearing impairment both before and throughout trial. At the July 6, 1998 hearing, appellant told the court that he was hard of hearing. The trial judge instructed appellant to raise his hand any time that he did not hear the proceedings.

**{¶57}** When trial began, the court addressed appellant, noting, "Mr. Taylor, if you at any point in time have a problem hearing anything that anyone

says, * * * please make yourself apparent to the Court. Raise your hand, indicate that you're not hearing things." Shortly thereafter, the court reminded appellant, "Let me know if you're unable to hear." Later, the court observed, "Mr. Taylor, from your questioning, it would appear that you're hearing everything that is going on." Appellant responded, "So far okay."

{¶58} On the second day of trial, after appellant had remarked, "I didn't hear," the court addressed appellant, stating, "Mr. Taylor, if you at all at any point in time have trouble hearing, let me know."

{¶59} Throughout the entire trial, appellant told the court at various times that he did not hear a question or answer. Whenever this occurred, the question or answer would be repeated.

{¶60} We believe that the trial court's approach in dealing with Taylor's hearing impairment was not unreasonable, arbitrary, or unconscionable and thus did not amount to an abuse of discretion. See *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144. Appellant did not request an evidentiary hearing or proffer expert testimony on his hearing impairment, as was the case in *Schaim*, and thus waived his right to complain about this issue now. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 605 N.E.2d 916. Furthermore, the record amply indicates that the trial court was cognizant of appellant's hearing impairment and was vigilant in ensuring that appellant heard everything that occurred during his trial. Therefore, we reject appellant's fourth proposition.

E. Voir Dire Issues

{¶61} In his twelfth proposition of law, appellant argues that the trial court erred in the manner that it permitted selection of a death-qualified jury. Specifically, appellant claims that the trial court erroneously applied the broad standard set forth in *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841, rather than a stricter standard required by Ohio law. Consequently, appellant asserts that the death qualification procedure produced a

jury that was exceptionally partial to the death penalty. Appellant does not point to any specific instances occurring during voir dire to buttress his assertions; rather, he concedes that the issue is raised for the possibility of federal habeas review.

{¶62} We have rejected this same proposition with regard to the standard set forth in *Wainwright v. Witt* many times. See, e.g., *State v. Wilson* (1996), 74 Ohio St.3d 381, 388, 659 N.E.2d 292. Moreover, our review of the voir dire transcript indicates that the trial judge did not abuse his discretion in finding that the death penalty views of those excused "would prevent or substantially impair the performance of" their duties as jurors. *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. We find proposition twelve not well taken.

### III. Trial Issues

### A. Expert Witnesses on Insanity Plea

{¶63} In appellant's first proposition of law, he argues that the trial court erred in excluding expert testimony that he proffered to support his plea of not guilty by reason of insanity.

{¶64} The defense of not guilty by reason of insanity is an affirmative defense that must be proved by the accused. R.C. 2901.05(A); see, also, R.C. 2901.01(A)(14). At trial, appellant subpoenaed three expert witnesses who had evaluated his sanity: Dr. Kim Stookey, Dr. Gordon Harris, and Dr. Thomas Martin. The trial court, in its discretion, conducted a voir dire of all three experts away from the jury. Dr. Stookey saw appellant twice for approximately six hours, and she opined, "I did not feel that he was insane. He was sane at the time of the offense."

{¶65} Dr. Harris evaluated appellant and "concluded that [appellant] did not fit the criteria for a plea of not guilty by reason of insanity under the Ohio Revised Code."

**{¶66}** Dr. Martin also evaluated appellant and stated, "[O]n the date [of the] alleged offense Mr. Taylor was not legally insane. * * * Mr. Taylor did not have a mental disease or defect."

**{¶67}** At the conclusion of the voir dire of these witnesses, the trial court cited *State v. Mitts* (1998), 81 Ohio St.3d 223, 227, 690 N.E.2d 522, and invoked Evid.R. 403(A). The court held that Evid.R. 403(A) "mandates this Court to exclude evidence, when the probative value is substantially outweighed by danger of the confusion of issues or misleads the jury."

**{¶68}** None of the experts proffered by appellant supported his plea of not guilty by reason of insanity. In fact, appellant wanted to call them as witnesses in order to impeach their conclusions that he was sane at the time of the murders. He stated at the outset that he wanted to call these experts because "they never reviewed everything that was involved in this case, they left things out of their reports." Yet, all three experts stated during voir dire examination that they had considered the matters that appellant claimed they had supposedly left out of their reports, and none of the other matters raised by appellant altered their opinions on Taylor's sanity.

**{¶69}** This court has uniformly upheld trial courts that have excluded this type of testimony in the trial phase of criminal trials, including capital cases. Except in the mitigation phase, "a defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that, due to mental illness, intoxication, or any other reason, he lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime." *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895; accord *Mitts*, 81 Ohio St.3d at 227, 690 N.E.2d 522; *State v. Wilcox* (1982), 70 Ohio St.2d 182, 194, 24 O.O.3d 284, 436 N.E.2d 523.

**{¶70}** In our view, the expert testimony appellant offered did not support his insanity defense, since all three experts concluded that he was not insane at the

time of the murders. The evidence that appellant sought to introduce in the guilt phase had no probative value, and appellant's use of it would have had a strong tendency to confuse the issues. Moreover, since the evidence did not support appellant's defense, we find that excluding it did not prejudice appellant. Therefore, the trial court did not abuse its discretion in excluding this testimony. *Adams*, 62 Ohio St.2d at 157, 16 O.O.3d 169, 404 N.E.2d 144. Accordingly, we reject appellant's first proposition.

### B. Jury Instructions

{¶71} In appellant's fifth proposition of law, he alleges error in the trial court's jury instructions. Specifically, appellant argues that the state's burden of proof regarding mens rea was shifted to the accused by an instruction that created a mandatory rebuttable presumption of the mens rea element. Yet appellant cites no specific language from any of the trial court's instructions to support his allegation.

{¶72} We have rejected similar arguments many times. Here, the trial court's instruction on purpose was similar to the instructions we upheld in *State v. Getsy* (1998), 84 Ohio St.3d 180, 196, 702 N.E.2d 866; *State v. Loza* (1994), 71 Ohio St.3d 61, 80-81, 641 N.E.2d 1082; and *State v. Montgomery* (1991), 61 Ohio St.3d 410, 414-415, 575 N.E.2d 167. In the instant case, the trial court's instructions included the following:

{¶73} "If a wound is inflicted upon a person with a deadly weapon in a manner to destroy life or inflict great bodily harm, the purpose to cause the death may be inferred from the use of the weapon. Whether such inference is made rests entirely with you.

{¶74} "It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to cause the death * * *."

**{¶75}** As we have often stated, "A single instruction * * * may not be judged in artificial isolation but must be viewed in the context of the overall charge." *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Here, no burden of proof was shifted to the accused. Moreover, the overall charge clearly indicated that the burden was on the state to prove specific intent to kill and that the jury was required to find specific intent to kill before it could convict appellant of aggravated murder. Accordingly, we reject appellant's fifth proposition.

## C. Gruesome Photographs

**{¶76}** In appellant's eighth proposition of law, he alleges that the trial court denied him a fair trial by admitting numerous photographs of the two deceased victims.

**{¶77}** Under Evid.R. 403 and 611(A), the admission of photographs is left to a trial court's sound discretion. *Landrum*, 53 Ohio St.3d at 121, 559 N.E.2d 710; *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 473 N.E.2d 768. Nonrepetitive photographs in a capital case, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. Id., paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267.

**{¶78}** In particular, appellant complains about the admission of state's Exhibit 18, which contained several photographs of the murder victims. Appellant asserts that the state had already presented an overwhelming amount of evidence that both victims were dead and alleges that the photos were cumulative and not of probative value.

**{¶79}** We find, however, that the trial court did not abuse its discretion in admitting these photographs. All of these photos illustrated the coroner's testimony describing the injuries sustained by Ron and Carolyn Rihm and helped to prove the killer's intent and the lack of accident or mistake. Since appellant

maintained that the victims were shot accidentally during a struggle for the gun with Ron Rihm, the photos helped rebut that assertion. Moreover, the photos also gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042. We therefore reject appellant's eighth proposition.

## IV. Effective Assistance

{¶80} In his seventh proposition of law, appellant claims that his performance as his own attorney was clearly deficient and that he was prejudiced by it.

{¶81} The right to effective assistance of counsel is rooted in the Sixth and Fourteenth Amendments. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. However, appellant waived his right to counsel and, as a result, waived any right he had to challenge the effectiveness of counsel. Appellant insisted on his right to self-representation, although he was given several opportunities during the trial to utilize appointed counsel, who served as backup counsel during the trial phase. When the court advised appellant that it would be a good idea to end his self-representation and bring back counsel, appellant replied: "I do not want that to happen."

{¶82} There is no doubt that appellant's performance as his own counsel was counterproductive. Nevertheless, the right to effective assistance of counsel necessarily presumes that the defendant has counsel. The law pertaining to effective assistance of counsel does not apply when the defendant exercises his right to self-representation. To rule otherwise would undermine the constitutional right of self-representation identified in *Faretta,* supra. The *Faretta* court noted that a criminal defendant who decides to represent himself cannot later complain that he was denied the effective assistance of counsel. Id., 422 U.S. at 834, 95 S.Ct. 2525, 45 L.Ed.2d 562, fn. 46. See, also, *United States v. Flewitt* (C.A.9,

1989), 874 F.2d 669, 674; *United States v. Smith* (C.A.6, 1990), 907 F.2d 42, 45; *Gall v. Parker* (C.A.6, 2000), 231 F.3d 265, 320.

{¶83} The constitutional right to represent oneself would become a hollow right and its assertion would most likely be rejected with regularity if pro se defendants were permitted to assign as error their own ineffectiveness.

{¶84} In addition, appellant was not prejudiced by his decision to waive counsel, given the overwhelming evidence of his guilt. Thus, we reject appellant's seventh proposition.

## V. Constitutionality

{¶85} In his ninth, tenth, eleventh, thirteenth, and fourteenth propositions of law, appellant challenges Ohio's death penalty statutes on numerous constitutional grounds. However, these arguments can be summarily rejected. See, e.g., *State v. McNeill* (1998), 83 Ohio St.3d 438, 453, 700 N.E.2d 596; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *Maurer,* 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768; *State v. Gumm* (1995)*,* 73 Ohio St.3d 413, 653 N.E.2d 253; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## VI. Independent Review and Proportionality

{¶86} At the mitigation hearing, appellant gave an unsworn statement wherein he chronicled his various complaints about his estranged wife. He also complained that several witnesses had lied on the stand during trial. Appellant then asked the jury to recommend a death sentence since he had "nothing to look forward to in life but death itself."

{¶87} Dr. Jeffrey Smalldon, who had met with appellant six times, encompassing 15 to 20 hours of face-to-face examination, testified on his behalf. Dr. Smalldon testified that appellant was the youngest of five children and that he had dropped out of school at age 15 to assist his family financially. Appellant married Pat when he was 21 years old and worked as an electrician at Delphi

Chassis for approximately 35 years. Dr. Smalldon described appellant's marriage as "46 years of pure violence, [with] * * * a few prolonged periods of calm." He observed that there was a great deal of turmoil and turbulence during most of the marriage.

{¶88} According to Dr. Smalldon, appellant is of average intelligence but suffers from a paranoid personality disorder, and his personality has narcissistic and passive-aggressive components. Appellant also has a depressive disorder and a history of alcohol abuse. Appellant suffers lower back problems that have caused him a lot of pain and discomfort since the early 1990s. He suffered a heart attack in 1990 and has blood-sugar problems.

{¶89} Appellant's personality disorder causes him to focus on small, inconsequential matters rather than on matters that are of considerable significance to his welfare. Appellant also sees people as mocking him or conspiring behind his back. As a byproduct of his personality disorder, appellant showed extreme preoccupation with and fixation on unresolved problems in his 46-year relationship with his wife.

{¶90} Nonetheless, Dr. Smalldon found that appellant did not suffer from a mental disease as that term is used in the legal sense. Appellant was not insane and understood right from wrong.

{¶91} Appellant's daughter-in-law, Rebecca Taylor, also testified at the mitigation hearing. Her marriage to appellant's son, Ron, produced two grandchildren for appellant. Rebecca stated that she has had a very good and open relationship with appellant since his incarceration. She testified that he now reads the Bible but feels that God has abandoned him since the guilty verdict. Rebecca pleaded with the jury not to impose the death penalty.

{¶92} The evidence proves beyond a reasonable doubt that appellant murdered Ron and Carolyn Rihm and attempted to kill his wife and James Tipton in the course of this conduct, pursuant to R.C. 2929.04(A)(5). Appellant's claim

that he was trying to commit suicide and that Ron Rihm struggled with him when the gun was accidentally fired lacks serious credibility and is contradicted by every eyewitness to the shootings, save appellant himself.

{¶93} The nature and circumstances of the offense offer nothing in mitigation. After appellant's wife left the marital home, he hired a private investigator to locate his estranged wife and then monitored her in the weeks leading up to the murders. Appellant's obsession with his wife was coupled with his expressed feeling that the Rihms were interfering with his marriage. He asked a friend about the effect of hollow-point bullets when fired from a gun. On the day of the murders, he unsuccessfully tried to win back his wife's attention by having flowers sent to her and by wanting to sit with her and talk. When she rebuffed appellant the final time and that rebuff was relayed to him by Ron Rihm, appellant fired shots at Pat and the Rihms.

{¶94} Appellant's history, character, and background provide some features in mitigation. He had been a productive citizen in that he held the same job for approximately 35 years.

{¶95} With regard to the mitigating factors of R.C. 2929.04(B)(5), the parties stipulated that appellant lacks a significant history of prior criminal convictions and juvenile adjudications. Appellant's personality disorder and his obsession with unresolved problems arising out of his turbulent marriage fall within R.C. 2929.04(B)(7) and deserve some weight in mitigation. However, as Dr. Smalldon conceded, appellant's disorder is a mental illness but does not qualify as a mental disease or defect as a matter of law.

{¶96} We find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Appellant stalked his estranged wife and the couple who sheltered her in the weeks leading up to the murders. When appellant tried to talk with her at the Valentine's Day dance, he shot at her after she refused to talk with him. He next turned his gun on the two people he

believed to be interfering with his marriage and had fatally shot both in the head. He then fired a shot at James Tipton, who tried to wrest the gun away from him. Appellant's actions merit the capital penalty to which he was sentenced.

{¶97} The death penalty is both appropriate and proportionate when compared with capital cases involving a course of conduct involving the purposeful killing or attempted killing of two or more persons. See, e.g., *State v. Davie* (1997), 80 Ohio St.3d 311, 686 N.E.2d 245; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 653 N.E.2d 304; and *State v. Sowell* (1988), 39 Ohio St.3d 322, 530 N.E.2d 1294.

{¶98} For the foregoing reasons, we affirm appellant's convictions and death sentence.

Judgment affirmed.

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

William F. Schenck, Greene County Prosecuting Attorney, and Robert K. Hendrix, Assistant Prosecuting Attorney, for appellee.

Suzanne M. Lough Wynn and Donald E. Oda II, for appellant.

_____