[Cite as *State v. Powell*, 2024-Ohio-6013.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | C.A. No. 30910 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| SYDNEY NICOLE POWELL | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2020-03-1008 |

DECISION AND JOURNAL ENTRY

Dated: December 26, 2024

HENSAL, Judge.

{¶1} Sydney Powell appeals her convictions in the Summit County Court of Common Pleas. This Court reverses.

I.

{¶2} After graduating high school, Ms. Powell enrolled as a first-year student at Mount Union College. Mount Union placed her on academic probation after her first year, and, after her academic performance did not improve, she was placed on academic suspension after the first semester of her second year. Ms. Powell did not tell her family or friends; instead, she returned to campus in January and moved into her residence hall as though nothing had happened. After Ms. Powell's sorority president questioned why her name did not appear on a membership roster, the associate dean of students contacted Ms. Powell. Although Ms. Powell initially denied that she was suspended, she eventually acknowledged that she was aware of the suspension. The associate dean set a timeline for Ms. Powell to move out of the residence hall, and Ms. Powell agreed.

**{¶3}** When the deadline passed, however, the associate dean learned that Ms. Powell was still living in the residence hall. During a second meeting between the official, Ms. Powell, and the Vice President of Student Affairs, Ms. Powell acknowledged that she was required to move out, stated that her parents were aware of her suspension, and represented that she just needed more time to do so. Yet again, Ms. Powell did not move out by the deadline. When staff approached her in the residence hall, she refused their offer to contact her parents and moved her belongings out immediately. Over the next week, Ms. Powell stayed in local hotels, visited her home when her parents were not there, and sent text messages to friends. On the evening of March 2, 2020, Ms. Powell returned to campus and watched "The Bachelor" with her friends.

**{¶4}** When Ms. Powell returned to Mount Union in January, her father, S.P., noticed that he could not access the parent financial portal. When he asked Ms. Powell about the problem, she told him that she would take care of it. On the morning of March 3, 2020, S.P. received a call at work from Mount Union informing him that Ms. Powell was no longer enrolled and directing him to Ms. Powell for further information. Using a location-sharing app on his smartphone, S.P. noted that Ms. Powell was at home at a time she should not have been there. He left his phone at work so that Ms. Powell could not track his location and drove to his home, where he found Ms. Powell. During the conversation that followed, Ms. Powell expressed frustration that her friends seemed to have figured out their lives while she had not. S.P. urged her to talk to her mother, B.P. One of them contacted B.P., who told her coworkers that she needed to go home to deal with a problem involving her daughter. S.P. returned to work before B.P. arrived. At 12:36 p.m., B.P. sent him a text to confirm that she was pulling into the driveway.

**{¶5}** On March 3, 2020, the Dean of Students at Mount Union received a message that B.P. had called to discuss Ms. Powell. The note that the message was written on also said that Ms.

Powell was sitting next to B.P. when she called. The dean asked the associate dean to join him for a telephone conversation with B.P., and they returned the call from his office. B.P. answered the call, and they identified themselves. The conversation did not progress any further. At that point, they heard a "thump" or a "thud" that was "accompanied by a pretty large scream." After that, they heard "an expulsion of air, like the air was knocked out of somebody[,]" the sound of the phone falling to the ground, and "a number of thumping sounds that went on for . . . maybe 15 seconds or so." They heard crying and screaming that seemed to get further away and then to approach the phone again, followed by sounds "like a hard item hitting something . . . ." When the call dropped, they tried to call back. On the third attempt, within about one and-a-half minutes later, a "very calm" voice answered, but the dean recognized that it was not the person he had spoken to before. When he addressed Ms. Powell by name, the call dropped. The associate dean contacted the Akron Police Department directly to avoid being routed through Stark County's 911 system, and officers were dispatched for a welfare check at Ms. Powell's residence in response.

{¶6} At 12:51 p.m., S.P. received a call from his life-long friend, Detective Kenneth Dies. Detective Dies had recognized S.P.'s address in radio traffic, and he informed S.P. that officers had been dispatched to his home for a welfare check. S.P. attempted to reach B.P. unsuccessfully, but he did speak with Ms. Powell, who told him that B.P. was on the phone with officials from Mount Union. When S.P. told her that police were on their way to the house, Ms. Powell lost her composure and told him that someone had broken into the house.

{¶7} When the officers arrived, they heard a woman crying for help. In the back of the house, they found that a window was open, a sliding glass door was ajar, and there appeared to be blood on the vertical blinds. One of the officers found Ms. Powell, who was yelling that her mother was in the back of the house. According to their testimony, Ms. Powell told them that after hearing

a noise, her mother told her to leave the house. She told the officers that when she heard screaming, she went inside and found her mother on the floor. The officer noted that Ms. Powell had cuts on her own hand that were actively bleeding. The officer found B.P. in a bedroom lying face-up on the floor. A cellphone, a large cast-iron skillet, and a knife were found near her body. B.P. died as a result of her injuries.

{¶8} Ms. Powell provided her name to the officers outside the house, then dropped to the pavement and stopped answering questions. Although she was transported to the hospital by EMS, Ms. Powell quickly became a suspect in B.P.'s death. She was involuntarily admitted to Akron General until March 16, 2020, after an emergency psychiatric evaluation. Ms. Powell was charged with two counts of murder and one count each of felonious assault and tampering with evidence, and she entered a plea of not guilty by reason of insanity ("NGRI"). Before trial, Ms. Powell moved the trial court to permit her to call witnesses to rebut the State's anticipated expert testimony related to the NGRI defense. The trial court denied the motion during trial but before the State's expert testified. After the State's expert testified, Ms. Powell renewed the motion, arguing that her experts could have rebutted specific points related to the methodology used and conclusions reached by the State's expert. The trial court denied the motion again, concluding that Ms. Powell had "had lots and lots and lots of expert testimony in this matter."

{¶9} The jury found Ms. Powell guilty of all the charges against her. The trial court determined that the two counts of murder and the count of felonious assault were allied offenses, and the trial court sentenced her to an aggregate prison term of fifteen years to life. Ms. Powell appealed, assigning four errors for this Court's review.

II.

## ASSIGNMENT OF ERROR I

THE [TRIAL] COURT COMMITTED PREJUDICIAL ERROR AND VIOLATED [MS. POWELL]'S FAIR TRIAL AND DUE PROCESS RIGHTS WHEN IT PREEMPTIVELY BARRED HER FROM PRESENTING SURREBUTTAL WITNESSES.

{¶10} Ms. Powell's first assignment of error raises two arguments regarding the presentation of evidence to rebut the testimony of the State's expert witness: that the trial court erred by denying her pre-trial motion and that the trial court erred by refusing to permit surrebuttal after the State's expert testified. This Court agrees in part.

{¶11} The sanity of a criminal defendant is an affirmative defense, not an element of the charged offense. *State v. Garrett*, 2022-Ohio-4218, ¶ 127, citing *State v. Taylor*, 2002-Ohio-7017, ¶ 64. "A person is not guilty by reason of insanity only if the person proves that 'at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.'" *State v. Grate*, 2020-Ohio-5584, ¶ 76, quoting R.C. 2901.01(A)(14). Because a defendant must prove NGRI by a preponderance of the evidence, "[t]he proper standard for determining whether a defendant has successfully demonstrated this defense and thus is entitled to an NGRI instruction is whether he has introduced sufficient evidence, which if believed, would raise a question in the mind of a reasonable person concerning the existence of the issue." *Id*.

{¶12} Revised Code Section 2315.01(A) explains the order for the presentation of evidence in a trial. After opening statements, "[t]he party who would be defeated if no evidence were offered on either side, first, shall produce that party's evidence, and the adverse party shall then produce the adverse party's evidence." R.C. 2315.01(A)(3). After each party presents its case-in-chief, "[t]he parties shall then be confined to rebutting evidence, unless the court for good

reasons and in the furtherance of justice, permits them to offer evidence in their original cases." R.C. 2315.01(A)(4).

{¶13} Because it is an affirmative defense, Ms. Powell bore the burden of demonstrating that she was not guilty by reason of insanity by a preponderance of the evidence. *See Grate* at ¶ 76. NGRI was an issue on which Ms. Powell "would be defeated if no evidence were offered on either side . . . ." R.C. 2315.01(A)(3). For purposes of NGRI, the appropriate time for Ms. Powell to present her evidence was during her own case-in-chief. *See Cities Serv. Oil Co. v. Burkett*, 176 Ohio St. 449, 452 (1964). After Ms. Powell's case-in-chief, the State could present both rebuttal evidence with respect to its own case-in-chief and, as the adverse party with respect to NGRI, the State could also present its own evidence on that issue. After that, Ms. Powell could present rebuttal evidence on the issue of NGRI if appropriate. *See* R.C. 2315.01(A)(4). *Compare Shifflet v. Barnhart*, 1987 WL 33010, *3 (5th Dist. Dec. 24, 1987) (explaining the order of presenting evidence when the defendant bears the burden of proving an affirmative defense). Consequently, as the substance of Ms. Powell's argument recognizes, the question before this Court is not whether the trial court abused its discretion by denying her the ability to present surrebuttal evidence but whether the trial court erred by concluding that she could not present *rebuttal* evidence in the first instance.

{¶14} "Rebutting evidence is that given to explain, refute, or disprove new facts introduced into evidence by the adverse party; it becomes relevant only to challenge the evidence offered by the opponent, and its scope is limited by such evidence." *State v. McNeil*, 83 Ohio St.3d 438, 446 (1998). *See also Nickey v. Brown*, 7 Ohio App.3d 32, 35 (9th Dist. 1982). To be presented as rebuttal evidence, testimony must meet two criteria: it must be a matter that was "first addressed in [the] opponent's case-in-chief" and it should not be a matter "brought in the rebutting

party's case-in-chief." *Pfung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410 (1994). When both criteria are met, "[a] party has an unconditional right to present rebuttal testimony . . . ." *Id.* With respect to expert testimony,

> [r]ebuttal is not testimony that was or should have been raised in the plaintiff's case in chief. [*Phung* at 410-411]. Rebuttal testimony is not merely a restatement or repeat of the expert opinion first given by the plaintiff's expert in the plaintiff's case in chief; its presentation is not warranted merely because a defense expert gave an opinion contrary to the plaintiff's expert.

*Mitchell v. Columbiana Cty. Mental Health Ctr.*, 2001 WL 1647180, *3 (7th Dist. 2001). A party need not preemptively counter an opponent's argument, however. *Id.* at *4. Consequently, when an opposing expert offers an alternative explanation, it becomes material after that expert testifies and is the proper subject of rebuttal testimony. *See State v. Iakobets*, 2017-Ohio-910, ¶ 10 (9th Dist.). This is true regardless of whether the explanation offered by the expert was also posed as a theory during cross-examination of another expert. *Id.*

{¶15} In her case-in-chief, Ms. Powell presented the testimony of three expert witnesses. After each expert testified, the State conducted a brief cross-examination. Dr. James Reardon, who practices forensic psychology, testified that he met Ms. Powell on two dates for eight to ten hours of evaluation, and he described the psychological assessments that he administered to her. Dr. Reardon explained that psychological assessments function as a check on the individual performing the evaluation, and he explained that he would not be comfortable diagnosing a severe mental disease without conducting assessments. As a result of his evaluation, Dr. Reardon determined that at the time of the murder, Ms. Powell was suffering from a first episode of schizophrenia and a major depressive disorder, single episode, which he characterized as both severe and accompanied by psychotic features. Dr. Reardon testified that at the time she

committed the murder, Ms. Powell was in a psychotic state – or, "out of touch with reality and unable to know the wrongfulness of her acts."

{¶16} Dr. Reardon further explained that her schizophrenic and psychotic episode was preceded by early indicators of onset that can be noted in retrospect, but that would have been difficult to detect at the time. These included a deteriorating connection to reality over the six-month period of time before the murder, decreased concentration, social withdrawal, and depressed mood. Dr. Reardon opined that by the time that Ms. Powell returned to campus in January 2020, she "was on a real slippery slope in terms of her mental and emotional state deteriorating" and noted that she was "well on her way to a final [psychological] decline" that was ultimately precipitated by Mount Union's action. He explained that in the week before the murder, Ms. Powell actively manifested auditory hallucinations and exhibited behavior inconsistent with normal functioning. According to his testimony, Ms. Powell was "departing further and further from reality, and decompensating into a full-blown psychotic state" at that point, and, by the time she arrived at her home on the date of the murder, she was "in the midst of a full-blown psychotic episode." Dr. Reardon testified that manner of B.P.'s death influenced his opinion about whether Ms. Powell appreciated the wrongfulness of her conduct, noting that it "demonstrate[ed] . . . the incredible magnitude of the loss of reality and the loss of any ability to engage in any, any reasoning or conscious thought during those moments."

{¶17} Dr. Thomas Swales, a forensic neuropsychologist employed by the Cuyahoga County Court of Common Pleas Psychiatric Clinic, also testified as an expert for Ms. Powell. Dr. Swales explained that he based his evaluation of Ms. Powell on a structured clinical interview – a format in which he "ha[s] been tested against other psychiatrists using the same tools to see if we come up with the same answers." He opined that at the time of the offense, Ms. Powell was

suffering from a first episode of schizo-affective disorder, bipolar type, and was in an acute psychotic state that impacted her ability to know the wrongfulness of her actions. According to Dr. Swales, Ms. Powell was "living a delusion" and was "completely totally out of her mind."

{¶18} With respect to malingering, Dr. Swales acknowledged that Ms. Powell was slightly over the threshold score for possible malingering on the Miller Forensic Assessment of Symptoms Test, but he explained that that assessment is not a diagnostic tool. Dr. Swales also administered the Structured Interview of Reported Symptoms – Second Edition, the Medical Symptom Validity Test, and the Nonverbal Medical Symptom Validity Test. He testified that malingering was not indicated as a result of those assessments with a high degree of certainty and noted that a diagnosis of malingering in this case would not make sense. Dr. Swales also noted that he would not diagnose malingering without administering those diagnostic assessments.

{¶19} Ms. Powell's third expert witness was Dr. Robin Belcher-Timme, a licensed psychologist with an independent practice in forensic psychology. Dr. Timme[1] spent approximately five hours conducting a clinical forensic interview of Ms. Powell, and he administered the Minnesota Multiphasic Personality Inventory – Third Edition and the Miller Forensic Assessment of Symptoms test to her. He testified that at the time of the murder, Ms. Powell was suffering from a first episode of acute schizo-affective disorder, depressive type, and that her symptoms were so severe that she did not appreciate the wrongfulness of her actions. He characterized Ms. Powell's condition on that date as "First Episode Psychosis" and acknowledged that her case was "atypical" because she did not have a long history of psychosis and indicators of future violent behavior were absent.

---

[1] The witness explained that he is ordinarily called "Dr. Timme," so this opinion refers to him in that way.

{¶20}   With respect to her behavior prior to the murder, Dr. Timme explained that "[w]hen somebody is psychotic, it is a symptom to not believe you are psychotic."  He testified that Ms. Powell's first semester at Mount Union was characterized by social anxiety followed by a separation from reality that developed over time "to the point where she's created a separate reality and has untethered from the world as we all know it."  Noting that the State's expert analyzed Ms. Powell's cellular phone usage from the week before the murder, Dr. Timme explained that psychosis manifests and abates over time, offering "opportunities for her to desperately hold on to some sense of normalcy in her life . . . ."  Dr. Timme explained that Ms. Powell's behavior after the murder could be explained by the fact that she remained in a psychotic state or, in the alternative, that she was experiencing moments of lucidity that induced a trauma response.

{¶21}   Dr. Timme testified that Ms. Powell's medical records from the weeks after the murder indicate that those who treated her uniformly recognized that she was suffering from a severe mental illness.  He also testified that Ms. Powell's score on the Miller Forensic Assessment of Symptoms Test fell below the threshold that suggests the presence of malingering and that he did not observe indications of malingering during his evaluation.  He also emphasized that because the consequences of being characterized as a malingerer are so serious, he would not make that diagnosis without administering diagnostic assessments.

{¶22}   The State called a single expert witness, Dr. Sylvia O'Bradovich, to testify regarding the NGRI defense.  The expert report that Dr. O'Bradovich prepared reviewed Ms. Powell's recent social history in conjunction with "collateral records" that included her cellular phone usage and academic records from Mount Union.  Dr. O'Bradovich's report noted that during the two hours that she spent interviewing Ms. Powell, Ms. Powell "was less than honest and forthcoming . . . ."  Dr. O'Bradovich observed that Ms. Powell "tended to respond vaguely, omit

or distort relevant details, or assert that she was unable to remember or did not know the information that might reflect her in an unfavorable light." Dr. O'Bradovich also noted that Ms. Powell "tended to exaggerate or feign having symptoms of a severe mental illness that she claimed rendered her unable to function." In the course of her report, Dr. O'Bradovich summarized Ms. Powell's cellular phone activity during the week that preceded the murder, the information gained during the police investigation, and Ms. Powell's medical records. Dr. O'Bradovich opined that Ms. Powell did not meet the criteria for a severe mental illness at the time of the murder, that her "symptom presentation is not credible[,]" and that she appreciated the wrongfulness of her actions at the time of the murder. Dr. O'Bradovich's report did not explain her methodology in detail or comment on the methodology employed by Ms. Powell's experts.

{¶23} During her testimony, Dr. O'Bradovich summarized the conclusions contained in her report. She also distinguished her methodology from the methodology employed by Ms. Powell's experts, explaining that "[I]n clinical work . . . you take what's reported to you and you just assume that it's a hundred percent honest. There's no reason to lie." She then noted that her "approach was slightly different. I took everything that was reported to me, I compared it with all the things that we know to be true, and it did not add up to schizophrenia or insanity at the time of the crime." Dr. O'Bradovich explained that she examined Ms. Powell's cellular phone records because "[t]he best source of information for an insanity evaluation is all of the data and evidence for that timeframe. So the best way to know what someone's mental state is is by the things they were doing and saying at that time." Dr. O'Bradovich explained that she did not administer any assessments to Ms. Powell because they would be irrelevant to determining her mental state at the time the murder was committed.

{¶24} During cross-examination, Dr. O'Bradovich reiterated that a present mental health problem has no bearing on mental status at the time a crime is committed. She also summarized the difference between her methodology and the methodology employed by Ms. Powell's experts:

Q: Okay. So Dr. Swales, Dr. Rardon, Dr. Timme, they have a combined 50 years experience. Combined they did 25 different psychological tests. And you are saying to this jury you are not taking issue with the way they scored those tests, right?

A: No. My issue is, is what's being given the, [*sic*] when you have data you have to determine how important and how credible that data is. And so our difference of opinion is clear, but I think the approach was also pretty different, which is that my investigation and all of the time for the evaluation was spent on the time period of the crime.

Whereas they took lots and lots of data from the time period of meeting with her. Which, you know, unfortunately is not the most relevant data.

Q: Yeah. You're saying she was malingering and these three doctors missed it?

A: I'm saying these three doctors focused and believed everything she said. And I compared everything she said to what we know to be true, and it didn't match.

Regarding the administration of assessments designed to diagnose malingering, Dr. O'Bradovich opined that assessments can only diagnose malingering at the moment the test is given and that no assessment can indicate past malingering.

{¶25} Dr. O'Bradovich's testimony, therefore, did not only describe her conclusions about whether Ms. Powell met the criteria for NGRI. Without question, Dr. O'Bradovich disagreed with Ms. Powell's experts on that ultimate issue. Her testimony went beyond that question, however. She also described her own methodology and offered pointed critique of Ms. Powell's experts, characterizing the bases of their expert opinions as both fundamentally flawed and irrelevant to the question at hand. These matters were addressed for the first time in the State's case-in-chief regarding NGRI, and testimony rebutting these arguments would not have merely

reiterated matters brought in Ms. Powell's case-in-chief. *See Pfung*, 71 Ohio St.3d at 410; *Mitchell*, 2001 WL 1647180, at *3 (7th Dist.). Ms. Powell was not required to preemptively counter these arguments. *See Mitchell* at *4; *Iakobets*, 2017-Ohio-910, at ¶ 10 (9th Dist.). Considering that Dr. O'Bradovich did not include the critique in her expert report and the State's cross-examination of each expert was minimal, it may well have been impossible for Ms. Powell to do so in any event. Ms. Powell's proffered rebuttal, therefore, would have been "evidence . . . given to explain, refute, or disprove new facts introduced into evidence" by Dr. O'Bradovich. *McNeil*, 83 Ohio St.3d at 446.

{¶26} The trial court denied Ms. Powell's motion based solely on the conclusion that there has been "lots and lots and lots of expert testimony in this matter." Under these circumstances, however, Ms. Powell had an "unconditional right" to present rebuttal testimony. *See Pfung* at 410. This Court therefore agrees that once the State's expert had testified, the trial court erred by denying her the opportunity to present rebuttal testimony on NGRI. Ms. Powell's first assignment of error is sustained on that basis.

### ASSIGNMENT OF ERROR II

[MS. POWELL'S] CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### ASSIGNMENT OF ERROR III

[MS. POWELL'S] RIGHT TO A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS AND OHIO CONSTITUTION, ARTICLE I, SECTION 16, WAS VIOLATED WHEN THE PROSECUTOR MADE IMPROPER REMARKS AND SOLICITED TESTIMONY REGARDING [HER] DESIRE TO CONSULT COUNSEL.

### ASSIGNMENT OF ERROR IV

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT DENIED [MS. POWELL'S] MOTION IN LIMINE AND PERMITTED

GRUESOME PHOTOS AND TESTIMONY REGARDING THE VICTIM'S CAUSE AND MANNER OF DEATH, WHICH WERE NOT IN DISPUTE.

{¶27} Ms. Powell's second assignment of error is that her convictions are against the manifest weight of the evidence. Her third assignment of error argues that the State engaged in misconduct by commenting on her desire to remain silent after her arrest, and her fourth assignment of error argues that the trial court erred by admitting evidence that was irrelevant or unduly prejudicial. In light of this Court's resolution of her first assignment of error, her second, third, and fourth assignments of error are moot. *See* App.R. 12(A)(1)(c).

III.

{¶28} Ms. Powell's first assignment of error is sustained. Her second, third, and fourth assignments of error are moot. The judgment of the Summit County Court of Common Pleas is reversed, and this matter is remanded to the trial court for proceedings consistent with this opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

JENNIFER HENSAL
FOR THE COURT

SUTTON, P. J.
CARR, J.
CONCUR.


APPEARANCES:

DANIEL D. EISENBREI, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.