[Cite as *State v. Williams*, 2012-Ohio-1692.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 11 JE 3 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| LLOYD B. WILLIAMS, Sr., | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:          Criminal Appeal from Common Pleas
                                                              Court, Case No. 10 CR 61.

JUDGMENT:                                          Affirmed.

APPEARANCES:
For Plaintiff-Appellee:                          Attorney Jane M. Hanlin
                                                              Prosecuting Attorney
                                                              Jefferson County Justice Center
                                                              16001 State Route 7
                                                              Steubenville, OH  43952

For Defendant-Appellant:                     Attorney Kristopher Haught
                                                              Scarpone & Associates
                                                              2021 Sunset Boulevard
                                                              Steubenville, OH  43952

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated:  March 29, 2012

DeGenaro, J.

**{¶1}** Defendant-Appellant, Lloyd Williams, appeals the decision of the Jefferson County Court of Common Pleas, convicting him of felonious assault and sentencing him accordingly. Williams argues that his conviction was against the manifest weight of the evidence, and that the trial court erred in failing to instruct the jury on the lesser included offense of assault. Williams' arguments are meritless. His conviction for felonious assault was not against the manifest weight of the evidence. Because the evidence did not support a conviction on assault and an acquittal on felonious assault, the trial court did not err in refusing to instruct the jury on the lesser included offense of assault. Accordingly, the judgment of the trial court is affirmed.

**Facts and Procedural History**

**{¶2}** On July 7, 2010, the Jefferson County Grand Jury indicted Williams for one count of felonious assault (R.C. 2903.11(A)(1)), a second-degree felony. On July 16, 2010, Williams was arraigned, appointed counsel, and pled not guilty.

**{¶3}** On February 15, 2011, the case came before the court for a jury trial. The State called Officer John Lemal, who testified that he works for the Steubenville Police Department in the patrol division. On May 10, 2010, he was called to a residence at 826 Pekruhn Court around 9 or 9:30 a.m. When he arrived at the house, he saw Williams, the victim Sheila Thorn, and Thorn's daughter on the porch area. He described the parties as upset and explained that the daughter appeared the most upset. He explained that Williams was intoxicated and was drinking from a bottle of Wild Irish Rose. Officer Lemal stated that he did not see any injuries on Williams.

**{¶4}** Officer Lemal testified that Thorn had a large laceration on the left side of her face by her eye that was beginning to swell. He said that she was in bedclothes and it appeared that she had just woken up. He explained that backup arrived at some point, but initially he was on the scene by himself for several minutes. He separated Williams from Thorn and her daughter; he took Thorn and her daughter on the porch and Williams was inside the house. He testified that both Thorn and her daughter said that Williams was the cause of Thorn's injuries.

**{¶5}** After the backup officer arrived, Officer Lemal placed Williams under arrest

for domestic violence because Thorn told him that Williams struck her and she had obvious injuries. Officer Lemal testified that at that point, Williams started yelling to her, "Tell him that I didn't do it on purpose." Officer Lemal stated that it was clear that Williams knew that Thorn had been injured. The backup officer then transported Williams from the scene. Officer Lemal also stated that he did not locate any object in the house that might have been used to strike Thorn, but he explained that was not his primary concern.

**{¶6}** On cross-examination, Officer Lemal agreed that according to his report, his initial thought was that Thorn was struck by an object. He did not believe her injuries were from a fist and he explained that the injury looked as though something had cut her. He confirmed that the house did not appear to be in disarray. He explained that because he was the primary responding officer, he did not perform more than a brief interview with any of the parties.

**{¶7}** Officer Lemal testified that he was at the scene for approximately 15 minutes, and during that time, Williams did not fight or resist the officers. He confirmed that while Williams was being led away, he was making accusations about Thorn using or selling drugs. The officer stated that he did not observe any signs of intoxication from Thorn. He did not ask her if she had been using drugs or drinking either that day or the night before.

**{¶8}** On redirect, Officer Lemal testified that although Williams was not physically resisting, his behavior was erratic. Williams was initially charged with domestic violence, but that charge was elevated to felonious assault due to the injury.

**{¶9}** On recross, the officer testified that to his knowledge, Williams did not enter any area of the house to tamper with evidence or do anything to hinder the investigation.

**{¶10}** The State then called Dr. Ravinder Chopra, who testified that he has worked as a physician at the Trinity Medical Center emergency room for over 25 years. Dr. Chopra testified that he provided care to Thorn at the West campus on May 10, 2010. He reviewed State's Exhibit 1, the medical record for the services provided to Thorn. He stated that Thorn arrived at the emergency room at 10:32 a.m. Regarding her injuries, he

explained that Thorn presented to the emergency department due to a laceration on the left side of her face, and he ordered a CT of her facial bones. Dr. Chopra further testified that the medical report indicated that Thorn had blunt facial injuries, a fractured orbit, a fractured nasal bone, and laceration to the face. He explained that the CT showed that the bone next to Thorn's eye was shattered and as a result, there were some bony fragments just below her eye.

{¶11} Dr. Chopra testified that the report indicated that Thorn was "struck by an unknown object in the face." He said that Thorn was transferred from Trinity West to Pittsburgh.

{¶12} On cross, Dr. Chopra testified that Thorn had a history of arthritis and fibromyalgia. He stated that the report showed that Thorn was taking Paxil, Xanax, and Lyrica at the time of her admission. Paxil is an antidepressant, Xanax is for anxiety, and Lyrica is for pain. Counsel then asked whether Thorn denied any drug or alcohol use as far as her social history, and Dr. Chopra replied that she denied any drugs or alcohol. Dr. Chopra also testified that Thorn had broken bones and swelling, and the swelling could have resulted from chronic sinus problems. However, on redirect, he stated that Thorn's broken bones around the nasal passages and orbit were acute.

{¶13} The State next called Sheila Thorn. She testified that in May of 2010, she lived with her daughter Olivia, who is now 12, and Williams. She explained that at that point, Williams had been living with her for about eight months. She stated that on May 9, 2010, which was Mother's Day, she and Williams were bickering because she drove a neighbor, Eric Montgomery, to buy dog food at Kroger, and Williams found out about this. She explained that after they got the dog food, she dropped off Eric and went to her house.

{¶14} Thorn testified that when she got to her house, her neighbor Derrick Brown and his mother Tammy Brown were there, and Williams was cutting Derrick's hair. She explained that that all three were drinking liquor and she took a couple shots. She said that later on, Eric came over and Derrick was still there at that point. They were drinking vodka and beer, and she was drinking beer. She stated that Williams made sandwiches

for Eric and Derrick. Later in the evening, Eric and Derrick left her house, and then just she and Williams were there.

{¶15} Thorn explained that Williams left the house around 10 or 10:30 p.m., and then she was home alone. Olivia came home around 11 or 11:30 p.m., and then she and Olivia went to bed in their respective bedrooms. Thorn explained that Olivia was supposed to go to school the next day on Monday, May 10, and she stated that usually she gets Olivia up at 6 or 6:30 a.m. Thorn explained that she tried to wake Olivia up, but she said she was sick, so Thorn decided to let her stay home from school and go back to sleep. She stated that Williams was not home at that point. Thorn also went back to sleep in her room.

{¶16} Thorn testified that the next thing she remembers is God telling her she was not going to die and telling her to wake up. She stated that she sat up and blood started pouring out of her face. She confirmed that when she thought she heard God's voice, she heard it after she felt the hit, which felt like a sledge hammer to her head. She stated that her left eye was "crooked" and she had her comforter over her face. She also confirmed that when she came to, she saw Williams from his legs down and his feet were going out of the bedroom. She explained that he came back into the room while she was still in bed and hit her four more times in her cheek area. After that, she explained that she believed she was looking for her phone and could not find it, and then Williams told her to go wash herself off and to wash the comforter. Thorn stated that she got up to wash off and she put the comforter in water.

{¶17} Thorn testified that Olivia saw her and screamed. She explained that Williams wanted Olivia's cell phone, although he ended up giving it back to Olivia and Thorn motioned for her to call the police. She said that Olivia went into her room and she must have called the police. Thorn further explained that Williams saw Olivia on her phone and told her to give it to him. Thorn stated that she also tried to push the panic button on her alarm system to call the police.

{¶18} Thorn testified that the police arrived about 10 or 15 minutes later. She stated that an ambulance came to her house, but she refused to go to the hospital by

ambulance. The police took Williams away, and then her neighbor drove her and Olivia to Trinity West where she was treated in the emergency room.

**{¶19}** She explained that after the doctors saw her MRIs, they said she had more facial damage than they expected, so she was taken by ambulance to Allegheny Trauma Center. She confirmed that she had a cut on her face, and she stated that she was put under and stitched up. She testified that the doctors could not perform surgery on the fractures of her eye socket and nose because the bones were shattered. She explained that she still has shattered bone fragments in her face today and the doctor told her that she might need plastic surgery.

**{¶20}** Finally, when asked if she was ever able to see the object that hit her the first time, she replied that she did not know what hit her.

**{¶21}** On cross-examination, Thorn testified that when Officer Lemal arrived at her house, Williams let him in and she was still inside in her underwear. She agreed that when she first spoke with the officer on the scene, she indicated that she was struck with an unknown object and she did not mention anything about being struck again to the officer at that time. She further confirmed that at the emergency room she said she was struck with an unknown object and she did not mention being struck again. Thorn explained that she was hit twice, but she does not know what she was hit with the first time because she was asleep. She further explained that she did not tell the officer that she was hit again because there was not much time to say anything and the officer was trying to get Williams out of the house and did not really care about her.

**{¶22}** Thorn admitted that she was drinking and used marijuana on May 9. She confirmed that she was prescribed Xanax, Lyrica, and Paxil, but she did not have a chance to take them yet at the time of the incident. Thorn also admitted that she had been convicted of tampering with records, falsification, and theft.

**{¶23}** She confirmed that she and Williams were already in a romantic relationship prior to him moving in. Furthermore, she agreed that when their friends were over before the incident, "things were going fairly harmoniously."

**{¶24}** On redirect, Thorn agreed that the officers and hospital personnel asked her

what she was struck with and she told them that she did not know. She stated that the second time she was hit, she knew that it was a fist that struck her. She confirmed that she did not consume any alcohol, medication, or drugs on May 10th prior to the time she was struck.

{¶25} Regarding her prior convictions, she explained that the offense was in 1998 and involved a theft of welfare benefits.

{¶26} Next, the State called Detective John Lelless of the Steubenville Police Department, who testified that he took photographs of Thorn on May 12, 2010. The detective identified State's Exhibit 2 as the authorization for release of medical records signed by Thorn for Trinity Medical Center West and Exhibit 3 as copies of the photographs that he took. The State then moved to admit its Exhibits 1, 2, and 3, and rested its case. The defense objected to part of the documents in Exhibit 1, and the court admitted all of the exhibits over the objection. The defense then moved for a judgment of acquittal pursuant to Crim.R. 29(A), which the court overruled.

{¶27} The defense called Williams, who testified that on May 9, 2010, Derrick came over in the late afternoon for a haircut. He explained that he got in contact with Thorn over the phone to ask her to come home because they had plans for Mother's Day. He also explained that Thorn had previously made six to seven trays of lasagna and he was calling her to ask what they were going to do with the lasagna.

{¶28} Williams testified that Thorn returned home around 5:30 or 6 p.m. He explained that their neighbor Tammy came over to watch Derrick get his haircut, and she brought a fifth of Crown Royal. He testified that at one point, he discovered Thorn and Eric on the porch talking, and Thorn had brought him a slice of lasagna. Williams said that he knew Thorn and Eric had been together earlier in the day. Williams testified that Eric left to go home, and then later returned to their house.

{¶29} Williams testified that it was around 6 p.m. at this point and everyone was taking shots. He stated that they smoked a couple "weed blunts," and then Thorn went to the store to purchase more alcohol and pick up Olivia and her friend from the movies. He explained that while she was gone, he finished cutting Derrick's hair and then he, Eric,

and Derrick began playing cards.  Then while they were playing cards, Thorn returned with the girls.  He explained that Thorn joined the game and they played until around 11:30 p.m.  He also stated that Tammy left the house at some point.  Then Derrick left, and he, Eric, and Thorn continued to drink and smoke marijuana.  He stated that Eric left, and then his friend Virgil picked him up after 12 a.m. to purchase alcohol.

**{¶30}** Williams explained that he and Virgil returned to his house and then sat in the yard for around two hours and drank vodka.  They also snorted coke.  He explained that they then left the house and split up by Market Square.  Williams said that he returned home around 8 a.m., and he was stopped by a police officer on the way home.

**{¶31}** Williams testified that when he got home, Thorn was awake, and they had a discussion about what she had done the day before.  He claimed that he told Thorn to give him her marijuana and scales so that he could take it out of the house and hide it somewhere.  Williams then testified that he "took a hit of some substance and [he] freaked out."  He further explained:

**{¶32}** "All I know is something took place in her bedroom.  I didn't have nothing.  I didn't throw anything and she said I was – she said 'I'm bleeding.'  I'm like – I don't – I'm not – I don't know if I'm believing her or not and we just – just continued to keep talking.

**{¶33}** * *

**{¶34}** "I don't know – I mean, at the time I was – I was still getting high.  I was using.  Earlier that morning this had – we took – we hit us some crystal meth on some marijuana and I was constantly hearing voices and footsteps running behind me, this and that and somehow, this and that, I don't know – I don't even know where I got the – the Wild Irish Rose from that I had."

**{¶35}** Williams testified that he then called the police and asked to speak to Captain Young.  He told Captain Young that he was not sure if the captain was the officer who he spoke to on his way home.  Williams said that he needed to speak to him about something in private because he did not want to put anyone's business out there in regards to what was said to him on his way home.  Williams explained that he did not want the captain to speak Thorn's name out loud in case somebody was walking by, so

he asked him for another number and Captain Young gave him an extension number. He further explained that Thorn kept pushing the phone away when he tried to give it to her, and he stated that she was holding a black towel to her face.

**{¶36}** Counsel then asked Williams how Thorn sustained the injuries to her face, and Williams responded, "I take it I must have did it. I had – I must have did it but I would have never threw or hit her with nothing. * * * I don't know what happened. Alls I know is she said 'I'm bleeding. Would you give me a rag?' And at first I didn't understand what she was saying." Williams confirmed that the only people in the house at this point were himself, Thorn, and Olivia. He also agreed that it would be "unusual, if not impossible" for Thorn to give herself the injuries and stated that Olivia did not cause the injuries. Williams further testified: "I must have swung at her, swung my hand at her or something. I don't know." Finally, Williams testified that on the date of the incident, he had no reason to be angry at Thorn.

**{¶37}** On cross-examination, the prosecutor asked whether Williams was the one who hit Thorn, and he responded, "Not knowingly." Williams explained that when he said he took a hit of a substance and "freaked out," he meant that he was hearing things and footsteps were running behind him. When asked if these effects were due to his drug and alcohol consumption, he replied, "I don't know. I got a history of hallucinating. I've been a mental health patient since I was 20 years old. I supposed to be on medication." Williams confirmed that he took all the drugs and alcohol on his own.

**{¶38}** Williams stated that he did not know that Thorn was hurt until the day he went to court and saw her. He also admitted that he had continued to talk to Thorn since the time he has been in jail. When asked if he told her what to say on the stand, he said, "I didn't tell her – I told her how – how exactly what it went, that she wasn't asleep and she wasn't. She was talking to me."

**{¶39}** Williams confirmed that he had a prior criminal record, including a conviction for drugs and a conviction for attempted felonious assault.

**{¶40}** The defense next called Tammy Brown, who testified that she was at Thorn and Williams' house on May 9, 2010. She explained that Thorn arrived and offered her

some lasagna she had cooked for Mother's Day. She stated that she left around 6 p.m., and there were no problems while she was there.

{¶41} The defense then rested and moved for admission of Defendant's Exhibit 1. The defense requested a jury instruction on the lesser included offense of assault, which the court overruled.

{¶42} Following deliberations, the jury found Williams guilty of felonious assault (R.C. 2903.11(A)(1)).

{¶43} Following a sentencing hearing, the trial court issued a judgment entry on February 18, 2011, sentencing Williams to eight years of incarceration and ordering him to pay restitution of $786.63. The court also imposed a lifetime weapons disability upon Williams and notified him that he would be subject to post-release control for a period of three years upon his release from prison.

### Manifest Weight of the Evidence

{¶44} In his first of two assignments of error, Williams argues:

{¶45} "The trial court's finding of guilty was against the manifest weight of the evidence and was not supported by the sufficient evidence."

{¶46} Although Williams labels this assignment of error as an argument regarding both sufficiency of the evidence and manifest weight of the evidence, he only presents an argument that his conviction was against the manifest weight of the evidence in his brief.

{¶47} When reviewing a judgment under a criminal manifest weight standard of review, "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶48} This court's discretionary power to reverse on manifest weight grounds and grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction. *Thompkins* at 387. This standard is a high one because the

trier of fact was in a better position to determine credibility issues, by having personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Ali*, 154 Ohio App.3d 493, 2003-Ohio-5150, 797 N.E.2d 1019, at ¶36; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212. A reviewing court therefore should not interfere with the witness credibility and factual determinations of the jury, unless the record demonstrates that a reasonable juror simply could not have found the witness to be credible. *State v. Mock*, 187 Ohio App.3d 599, 2010-Ohio-2747, 933 N.E.2d 270, at ¶40.

**{¶49}** Williams was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which prohibits knowingly causing serious physical harm to another.

**{¶50}** Williams first argues that Thorn testified that she was sleeping when she was struck, so she was not able to identify who struck her or what she was struck with. While Thorn did testify that she was asleep when she was first struck, she stated that she saw Williams from the legs down as he was exiting the room. She also testified that Williams reentered the room and hit her four more times. Furthermore, Williams admitted that only he, Thorn, and Olivia were in the house during this incident and that it was unlikely that either Thorn herself or Olivia inflicted the injuries. Regarding what she was struck with, Thorn testified that she does not know what object initially struck her, but that when Williams hit her for the second time, he used his fist. While R.C. 2903.11(A)(2) prohibits knowingly causing physical harm by means of a deadly weapon, the provision Williams was convicted of, R.C. 2903.11(A)(1), does not contain a "deadly weapon" element that the state must prove.

**{¶51}** Williams next argues that Thorn was in no position to determine whether her injuries were caused purposefully or if it was an accident or recklessness. Essentially, Williams argues that the manifest weight of the evidence did not support the finding that he "knowingly" hit Thorn. However, Thorn testified that she was not asleep when Williams reentered the bedroom and struck her an additional four times, and if believed, this testimony does not appear to support the conclusion that Williams' actions were reckless or accidental. Furthermore, while Williams testified that he did not know what

happened, a reasonable jury could have found that his testimony was not credible. Williams was able to describe the events leading up to the incident in detail, as well as the events immediately after Thorn sustained her injuries. Moreover, while Williams testified that he did not realize that Thorn was hurt until he saw her in court, the responding officer testified that it was clear to him that Williams knew Thorn had been injured.

**{¶52}** Finally, Williams challenges Thorn's credibility, noting that she lied to the emergency room doctor about her drug and alcohol consumption on May 9, 2010. Thorn confirmed that she consumed drugs and alcohol on May 9; however, Dr. Chopra testified that the medical records indicated that Thorn denied drug and alcohol use. Although the jury could have considered Thorn's lie while judging her credibility, it does not appear that this lie completely undermines her credibility such that a reasonable jury could not believe her testimony about the incident. "While it is true that under a manifest weight analysis we consider the credibility of the witnesses, it must be remembered that primarily witness credibility is left to the trier of fact, which in this case was the jury. Or in other words, although an appellate court must act as a 'thirteenth juror' when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility." *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, at ¶18.

**{¶53}** This is not the exceptional case where the jury lost its way and created a manifest miscarriage of justice. Accordingly, Williams' first assignment of error is meritless.

### Lesser Included Offense

**{¶54}** In his second assignment of error, Williams asserts:

**{¶55}** "The trial court erred in not providing a jury instruction for assault."

**{¶56}** Williams argues that the trial court erred in overruling his request for a jury instruction regarding the lesser included offense of assault.

**{¶57}** "In determining whether an offense is a lesser included offense of another, a court shall consider whether one offense carries a greater penalty than the other,

whether some element of the greater offense is not required to prove commission of the lesser offense, and whether the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, at paragraph two of the syllabus, clarifying *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294.

**{¶58}** "The decision to give or refuse to give jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal unless the record affirmatively demonstrates an abuse of discretion on the facts and circumstances of the particular case." *State v. Bennett*, 7th Dist. No. 04-MA-184, 2006-Ohio-3566, at ¶23, citing *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443. An abuse of discretion means more than an error of law or judgment; but rather implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.

**{¶59}** Williams was charged and convicted of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony:

**{¶60}** "(A) No person shall knowingly do either of the following:

**{¶61}** "(1) Cause serious physical harm to another * * *."

**{¶62}** He argues that the trial court should have given a jury instruction on assault pursuant to R.C. 2903.13, a first-degree misdemeanor:

**{¶63}** "A) No person shall knowingly cause or attempt to cause physical harm to another * * *.

**{¶64}** "(B) No person shall recklessly cause serious physical harm to another * * *."

**{¶65}** This court has previously held that simple assault is a lesser included offense of felonious assault. *Bennett* at ¶31. A trial court is required to give a jury instruction on a lesser included offense "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, at paragraph two of the syllabus.

- 13 -

{¶66} An instruction on simple assault would be required if the jury could have reasonably found that either Williams recklessly, rather than knowingly, caused Thorn serious physical harm; or that Williams knowingly caused or attempted to cause Thorn physical harm, rather than serious physical harm. However, Williams does not appear to contest that he caused Thorn serious physical harm. Instead, he argues that "[t]he testimony as a whole does not show an individual who knowingly intended to inflict serious physical harm." Thus, the issue before us is whether the jury could have reasonably found that Williams acted recklessly, rather than knowingly.

{¶67} "Knowledge", the mens rea for felonious assault, is defined in R.C. 2901.22(B):

{¶68} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶69} "The test for determining whether a defendant acted knowingly is a subjective one, based on the knowledge, beliefs and circumstances of the individual defendant." *State v. McCleod* (Dec. 12, 2001), 7th Dist. No. 00 JE 8.

{¶70} "Recklessness", the mens rea for assault under R.C. 2903.13(B), is defined in R.C. 2901.22(C):

{¶71} "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

{¶72} Williams argues: "Mr. Williams' testimony was not that he did not strike Ms. Thorn but that he has a severe alcohol and drug problem and that he suffers from hallucinations and mental problems." Williams is arguing that he did not act knowingly due to his intoxication, which he admitted during cross-examination was voluntary. However, voluntary intoxication is no longer a defense to intent in Ohio:

{¶73} "Before October of 2000, voluntary intoxication was an available defense if it was shown to have prevented the defendant from forming the intent necessary to commit the charged offense. *State v. Johnson*, 7th Dist. No. 02 CA 206, 2004-Ohio-567, ¶12, citing *State v. Fox* (1981), 68 Ohio St.2d 53, 55, 22 O.O.3d 259, 428 N.E.2d 410. However, as of October 27, 2000, '[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense.' R.C. §2901.21(C)." *State v. Love*, 7th Dist. No. 02 CA 245, 2006-Ohio-1762, at ¶63.

{¶74} Thus, Williams' argument that he did not act knowingly due to his voluntary intoxication is meritless. He further attempts to assert an insanity defense, which he did not raise in the trial court, and there is no evidence in the record of Williams' mental illness beyond his own self-serving testimony. Therefore, Williams is precluded from arguing an insanity defense on appeal. See *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, at ¶64 ("The defense of not guilty by reason of insanity is an affirmative defense that must be proved by the accused.").

{¶75} Williams also contends that his testimony does not show that he acted knowingly because he testified that he does not recall what happened. However, his testimony that he does not know what happened does not establish the element of recklessness necessary for simple assault. In fact, the only testimony regarding how the injuries actually occurred came from Thorn who testified that she woke up to a feeling of a "sledge hammer" hitting her in the head. She testified that she saw Williams from legs down leaving the bedroom, and then he came back in and hit her four more times. A reasonable juror could not find that Williams acted recklessly from the testimony in the record.

{¶76} Because the evidence does not reasonably support a conviction on simple assault under R.C. 2903.13(B), the trial court did not err in refusing to give a jury instruction on the lesser included offense. Accordingly, Williams' second assignment of error is meritless.

{¶77} In sum, Williams' arguments are meritless. His conviction for felonious

assault was not against the manifest weight of the evidence because the jury could have reasonably believed Thorn's account of the events and found Williams' testimony that he did not remember what happened to be incredible.  Further, the trial court did not err in refusing to give a jury instruction on the lesser included offense of assault because the evidence did not reasonably support a conviction on assault or an acquittal on felonious assault.  Accordingly, the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Vukovich, J., concurs.