[Cite as *State v. Wesley*, 2015-Ohio-5031.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO.  CA2015-04-077 |
| Plaintiff-Appellee, | : | |
| | : | O P I N I O N<br>12/7/2015 |
| - vs - | : | |
| | : | |
| DAVID M. WESLEY, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2013-12-2048


Michael T. Gmoser, Butler County Prosecuting Attorney, Willa Concannon, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Charles M. Conliff, 5145 Pleasant Avenue, Suite 18, P.O. Box 18424, Fairfield, Ohio 45018-0424, for defendant-appellant


**S. POWELL, J.**

{¶ 1}  Defendant-appellant, David M. Wesley, appeals from his conviction and sentence in the Butler County Court of Common Pleas after a jury found him guilty of one count of felonious assault.  For the reasons outlined below, we affirm in part, reverse in part, and remand for the limited purpose of resentencing.

{¶ 2}  On February 12, 2014, the Butler County Grand Jury returned an indictment

charging Wesley with one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony. According to the bill of particulars, the charges stemmed from a physical confrontation between Wesley and Joseph Miracle on December 15, 2013, during which time Wesley was alleged to have "inflict[ed] an 8 centimeter cut to Mr. Miracle's left hand and seven extensor tendons." It is undisputed that the confrontation occurred near the Main Street Bridge located in Hamilton, Butler County, Ohio.

{¶ 3} On March 4, 2015, a jury found Wesley guilty as charged. The trial court then sentenced Wesley to three years in prison, ordered him to pay a $100 fine, and imposed a mandatory three-year postrelease control term. However, prior to issuing its sentencing decision, the trial court did not personally address Wesley to directly ask if he wished to make a statement on his own behalf or present any information in mitigation of punishment. Wesley now appeals from his conviction and sentence, raising two assignments of error for review.

{¶ 4} Assignment of Error No. 1:

{¶ 5} THE STATE'S EVIDENCE WAS CONSTITUTIONALLY INSUFFICIENT TO SUPPORT THE CONVICTION FOR FELONIOUS ASSAULT.

{¶ 6} In his first assignment of error, Wesley argues his conviction must be reversed because the state provided insufficient evidence to support his conviction for felonious assault. Specifically, Wesley claims the state "didn't prove that the injury [to Miracle's left hand] was caused by Mr. Wesley during this confrontation." We disagree.

{¶ 7} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Hoskins*, 12th Dist. Warren No. CA2013-02-013, 2013-Ohio-3580, ¶ 16, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the

average mind of the defendant's guilt beyond a reasonable doubt. *State v. Kinsworthy*, 12th Dist. Warren No. CA2013-06-053, 2014-Ohio-1584, ¶ 52. The relevant inquiry is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Smith*, 12th Dist. Warren Nos. CA2012-02-017 and CA2012-02-018, 2012-Ohio-4644, ¶ 25, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. In other words, "the test for sufficiency requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 33. When evaluating the sufficiency of the evidence, this court defers to the trier of fact regarding questions of credibility. *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, ¶ 132.

{¶ 8} Wesley initially argues his felonious assault conviction must be reversed because the state provided insufficient evidence to show he "possessed or used a bladed weapon." However, as the state aptly notes, the provision that Wesley was convicted of violating, R.C. 2903.11(A)(1), does not require the state to prove Wesley ever possessed or used a weapon. *State v. Williams*, 7th Dist. Jefferson No. 11 JE 3, 2012-Ohio-1692, ¶ 50. Rather, to support a felonious assault conviction under R.C. 2903.11(A)(1), such as the case here, the state was only required to prove Wesley knowingly caused "serious physical harm" to Miracle. As defined by R.C. 2901.01(A)(5)(c), the phrase "serious physical harm" includes "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity."

{¶ 9} At trial, Miracle testified that while driving his truck through Hamilton with a family friend, Autumn Peterson, he briefly stopped at an intersection believing there was a stop sign. However, upon stopping his truck for just a few seconds, the car behind Miracle

- 3 -

honked. Realizing there was no stop sign, Miracle testified he then proceeded straight through the intersection. It is undisputed the car behind Miracle that honked was a purple PT Cruiser driven by Wesley. It is also undisputed that Wesley's mother, Rose, was sitting in the front passenger seat of the PT Cruiser at all times relevant.

{¶ 10} After crossing through the intersection, Miracle testified he switched lanes in order to continue going straight and "I guess maybe I cut [Wesley] off a little bit right there." Miracle then testified Wesley passed him and then "zoomed right back in front of me and cut me off and immediately stomped his brakes like to the point where it was what I call a brake check," thereby forcing Miracle to come to a complete stop. Miracle testified he then attempted to go around Wesley to "flip him off or whatever," when Wesley "jerked over" causing Miracle to slow down in order to avoid a collision. According to Miracle, this back-and-forth posturing continued for several blocks until Wesley "brake checked" him again as they approached the Main Street Bridge. However, instead of stopping behind the PT Cruiser, Miracle testified he switched lanes and again passed Wesley on the right.

{¶ 11} Once he passed Wesley, Miracle testified he stopped at a stop light, opened his door, leaned out of his truck, and "was like what the heck is your problem? I probably, I mean I probably cussed * * * and just slammed my door mad." According to Miracle, Wesley was stopped approximately 30 to 50 feet behind his truck at this time. Miracle then testified that after about ten seconds had passed, he looked over and saw Wesley standing right outside his driver's side door. Noting that his window was partially down in order to ventilate the smoke from Peterson's cigarettes, Miracle testified Wesley then "flinched" at him and stated "that's right. Like trying intimidation what I was thinking and I sat there kind of frozen still." Thinking Wesley was going to throw a punch, Miracle testified Wesley "twitched again so I like blocked [it with my left hand] and I was – there was a sound. I mean, I'll never forget the sound. * * * It sounded like a smack" and his left hand immediately went numb. Miracle

later testified the "smacking" he heard was the sound of his extensor tendons in his left hand being severed.

{¶ 12} Continuing, Miracle then testified as follows:

> I didn't know at the – for about five seconds that I was even cut. My hand collapsed. I thought it just went dead. You know, if you bang the back of your hand, how it will go numb or whatever. And I look and [Wesley] had run back to his car. And about that time, I realized my hand wasn't opening and I felt something – I had a coat on, I had a hoodie on and I had a long sleeve like, kind of like a thermal on and I felt like warm running down my hand.
>
> I pulled my sleeve up and as I pulled my sleeve up, it literally squirted blood and, I, "Oh my God Autumn, he cut me bad," was my exactly (sic) words. I remember from that second until I got to the hospital I remember everything like I can close my eyes and picture it frame by frame.

{¶ 13} After realizing he was injured, Miracle called 9-1-1 and chased after the fleeing Wesley in order to get the license plate number from the PT Cruiser. As Miracle testified, "I knew that if something was going to come out of it I needed his license plate number because otherwise there was no way for me to identify who did it." Eventually catching up to Wesley, Miracle provided the PT Cruiser's license plate number to the 9-1-1 operator. Police later traced the PT Cruiser's license plate to Wesley's mother, Rose. In describing the incident, Miracle also told the 9-1-1 operator that "[w]e came up to a stop light. And he jumped out of his car and came up. And my window was down. And he reached in and cut my hand wide open." Miracle then testified he had surgery to repair the severed extensor tendons in his left hand, but that he still suffers from nerve damage and has scar tissue that restricts his movement. The doctor who performed Miracle's surgery later testified and confirmed this testimony.

{¶ 14} Peterson also testified at trial. Peterson testified that she was sitting in the passenger seat of Miracle's truck when the purple PT Cruiser driven by Wesley honked as

they were stopped at an intersection. Realizing there was no stop sign, Peterson testified Miracle proceeded through the intersection and changed lanes when Wesley "sped up into the left lane and like swerved over on us, like trying to run us off the road." Peterson then testified Wesley got in front of Miracle's truck where he "brake checked" them on the Main Street Bridge.

{¶ 15} After swerving around Wesley, Peterson testified Miracle stopped at the stoplight and observed Wesley walking towards Miracle's truck "pretty fast." According to Peterson, Miracle then opened the driver's side door, leaned out and "had his arm like you know, like what are you doing," before shutting the door. Peterson then testified Wesley said, "yeah that's right or that's what I thought or something like that." Thereafter, upon Wesley reaching the driver's side door, Peterson testified Wesley "flinched" at Miracle in such a manner that looked like he was going to throw a punch. Peterson then testified she saw Wesley's "hand go up and like hit – I heard a smacking noise and I saw him hit – like [Miracle] to block it, like he was trying to punch him, and right after that I watch [Wesley] run, sprint back to the car[.]" Peterson further testified that she had previously identified a photo of Wesley as the individual who was driving the PT Cruiser and who had injured Miracle's left hand.

{¶ 16} Rose Wesley testified on her son's behalf. Rose testified she was sitting in the passenger seat of the purple PT Cruiser driven by her son when they approached Miracle's truck driving "really, really slow, I mean very slow." Rose then testified Wesley honked and sped past Miracle's truck. According to Rose, Wesley then "got in front of [Miracle] and he slowed down and that, and then [Miracle], I don't know, got mad, I don't know." Rose then claims Wesley continued driving when she looked over at Miracle's truck driving in the next lane and heard a bang. As Rose testified, "I, you know, kind of jumped and I said * * * he's throwing something at the car because it had hit the window." Rose claims that Miracle then

threw another unknown object that struck the PT Cruiser's front passenger door.   Both Miracle and Peterson denied ever throwing anything at the PT Cruiser.

{¶ 17} Continuing, Rose testified Miracle then pulled in front of the PT Cruiser and slammed on his brakes as they crossed the Main Street Bridge, thus prompting Wesley to do the same.   Rose then testified Miracle got out of his truck and started walking back towards the PT Cruiser.   Rose then testified, in pertinent part, as follows:

> A:  And by this time, my son, he took his seatbelt off and then he got out of the car.   And when he got out of the car and shut the door, and as he was getting ready to walk up to this guy, well the guy then turned around and got back in his truck.
>
> Q:  What happens when he gets back in his truck?
>
> A:  [Wesley] walks up there.   He was not like face to face with him because I can see his whole body.
>
> * * *
>
> Q:  So you were able to see the entire incident between Mr. Miracle and your son [Wesley]?
>
> A:  Yes.
>
> * * *
>
> Q:  What happens then?
>
> A:  And that – like it was cold that night.   My windows was rolled up.   I heard him – his lips – I seen his lips moving so I guess they were having a talk with each other.
>
> Q:  Okay.
>
> A:   And then after they got done whatever they was saying, [Wesley] just turned around and walked straight back to the car. And that's when we left and we went around that little bit – I don't know Hamilton so I can't –

Rose further testified that she did not see her son with a knife or any other weapon, nor did she see him strike or throw a punch at Miracle.

{¶ 18} After a thorough review of the record, we find the state provided ample and

- 7 -

overwhelming evidence to support Wesley's felonious assault conviction. As noted above, both Miracle and Peterson testified Wesley was the individual driving the PT Cruiser who approached Miracle's truck and injured Miracle's left hand, thus requiring him to get surgery to repair his severed extensor tendons. Although Wesley claims otherwise, Miracle's testimony, standing alone, was sufficient to support Wesley's felonious assault conviction without any additional corroborating evidence linking him to the crime. *See State v. Beaver*, 3d Dist. Union No. 14-13-15, 2014-Ohio-4995, ¶ 36 (felonious assault statute does not require corroborating evidence to support a felonious assault conviction); *see also State v. Hargrove*, 10th Dist. Franklin No. 05AP-547, 2006-Ohio-1030, ¶ 9 (testimony of the victim standing alone was sufficient to support a felonious assault conviction); *State v. Acevedo*, 11th Dist. Ashtabula No. 2002-A-0109, 2005-Ohio-3267, ¶ 27 (testimony from witnesses, including the victim, was sufficient to support a felonious assault conviction).

{¶ 19} Moreover, the fact that there was no direct testimony to prove Wesley actually used a weapon to injure Miracle's hand does not mean the state failed to provide sufficient evidence to support his felonious assault conviction. As noted previously, the provision that Wesley was convicted of violating, R.C. 2903.11(A)(1), does not require the state to prove Wesley ever possessed or used a weapon, but rather, only that Wesley knowingly caused "serious physical harm" to Miracle. Therefore, because any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, i.e., that Wesley knowingly caused "serious physical harm" to Miracle's left hand, we find the state provided sufficient evidence to support Wesley's felonious assault conviction. Accordingly, Wesley's first assignment of error is without merit and overruled.

{¶ 20} Assignment of Error No. 2:

{¶ 21} THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO PROVIDE APPELLANT WITH HIS RIGHT TO ALLOCUTION.

{¶ 22} In his second assignment of error, Wesley argues his sentence must be reversed because the trial court failed to provide him with his right of allocution. We agree.

{¶ 23} Pursuant to Crim.R. 32(A)(1), before imposing a sentence in a criminal trial, "the trial court shall 'address the defendant personally' and ask whether he or she wishes to make a statement on her own behalf or present any information in mitigation of punishment." *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 166. "The purpose of allocution is to permit the defendant to speak on his own behalf or present any information in mitigation of punishment." *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, ¶ 85. Although not considered a constitutional right, the right of allocution is firmly rooted in the common-law tradition. *State v. Copeland*, 12th Dist. Butler No. CA2007-02-039, 2007-Ohio-6168, ¶ 6. As a result, this right is "'both absolute and not subject to waiver due to a defendant's failure to object.'" *State v. Haynes*, 12th Dist. Butler No. CA2010-10-273, 2011-Ohio-5743, ¶ 27, quoting *State v. Collier*, 2d Dist. Clark Nos. 2006 CA 102 and 2006 CA 104, 2007-Ohio-6349, ¶ 92. Therefore, in cases where the trial court imposes a sentence without first asking the defendant whether he wishes to exercise his right of allocution, "'resentencing is required unless the error is invited error or harmless error.'" *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, ¶ 179, quoting *State v. Campbell*, 90 Ohio St.3d 320 (2000), paragraph three of the syllabus.

{¶ 24} In this case, the record indicates the trial court never personally addressed Wesley asking if he wished to make a statement on his own behalf or present any information in mitigation of punishment. Rather, after Wesley's trial counsel noted Wesley's minimal criminal history, recent divorce, financial status, and alleged non-violent tendencies, the trial court permitted Wesley's mother, Rose, to address the court. The trial court also permitted Miracle to address the court, wherein Miracle noted his surprise regarding Wesley's general lack of remorse and the serious impact the injury to his left hand has caused to his

everyday life. The following exchange then occurred:

> THE COURT: Thank you. Counsel, anything else to say?
>
> [WESLEY'S TRIAL COUNSEL]: He's just very upset at this point, Your Honor, and it's difficult for him to speak.

Without ever personally addressing Wesley directly, the trial court then sentenced Wesley to three years in prison, ordered him to pay a $100 fine, and imposed a mandatory three-year postrelease control term.

{¶ 25} As this court has stated previously, "Crim.R. 32 does not merely give the defendant a right to allocution; it imposes an affirmative requirement on the trial court to ask if he or she wishes to exercise that right." *State v. Larios*, 12th Dist. Preble No. CA2009-07-019, 2012-Ohio-4525, ¶ 21, citing *Campbell* at 323-324. As a result, "[t]he requirement of allocution is considered fulfilled when the conduct of the court clearly indicates to the defendant that he has a right to make a statement prior to the imposition of sentence." *State v. Harvey*, 3d Dist. Allen No. 1-09-48, 2010-Ohio-1627, ¶ 15, citing *Defiance v. Cannon*, 70 Ohio App.3d 821, 828 (3d Dist.1990). That simply did not happen here. The trial court, therefore, erred by not adhering to the allocution requirements mandated by Crim.R. 32(A)(1) before issuing its sentencing decision.

{¶ 26} Nevertheless, the state claims any error the trial court may have made in failing to personally address Wesley prior to issuing its sentencing decision was invited error. Specifically, the state claims the "affirmative statement by counsel invited the trial court to end any further inquiry regarding allocution." Under the invited error doctrine, which is applied when trial counsel is "actively responsible" for the trial court's alleged error, a party is not entitled to take advantage of an error that he himself invited or induced the trial court to make. *Haynes*, 2011-Ohio-5743 at ¶ 40. In turn, "[t]he rule of invited error prohibits a party who induces error in the trial court from taking advantage of such error on appeal." *State v.*

*Williams*, 12th Dist. Butler No. CA2006-03-067, 2007-Ohio-2699, ¶ 27.  This requires something more than merely acquiescing to the trial court's erroneous conclusion.  *Campbell*, 90 Ohio St.3d at 324.

{¶ 27}  We find no merit to the state's argument.  Although the state relies on the fact that Wesley's trial counsel informed the trial court that Wesley was "very upset" and that it was "difficult for him to speak," nothing in the record indicates Wesley could not speak or did not wish to speak if the trial court had provided him with such an opportunity.  In other words, had the trial court complied with its affirmative requirement by asking Wesley if he wished to exercise his right of allocution, Wesley may very well have taken advantage of his last opportunity to plead his case and express remorse prior to the trial court issuing its sentencing decision.  To assume otherwise is improper.  This is particularly true here considering Miracle had just noted his surprise regarding Wesley's general lack of remorse.  The state's argument alleging invited error is therefore without merit.

{¶ 28}  In light of the foregoing, because we find the trial court's error in failing to personally address Wesley at sentencing does not amount to invited error, Wesley's second assignment of error is sustained and this matter is remanded for the limited purpose of resentencing.  *See, e.g., State v. Bonner*, 12th Dist. Butler No. CA2012-09-195, 2013-Ohio-3670, ¶ 19.  Upon remand, the trial court is instructed to adhere to the allocution requirements mandated by Crim.R. 32(A)(1) by personally addressing Wesley and directly asking him if he wishes to make a statement on his own behalf or present any information in mitigation of punishment before imposing its sentence.

{¶ 29}  Judgment affirmed in part, reversed in part, and remanded for the limited purpose of resentencing.

PIPER, P.J., and RINGLAND, J., concur.

- 11 -