[Cite as *State v. Smith*, 2024-Ohio-5613.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio, :

    Plaintiff-Appellee, :

                                    No. 23AP-636

v. : (C.P.C. No. 22CR-1597)

Bettie J. Smith, : (REGULAR CALENDAR)

    Defendant-Appellant. :

D E C I S I O N

Rendered on November 26, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Michael A. Walsh*, for appellee.

**On brief:** *Wolfe & Mote Law Group, LLC*, and *Stephen T. Wolfe*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Bettie J. Smith, appeals the judgment of the Franklin County Court of Common Pleas following a jury trial and finding of guilt as to the offenses of aggravated robbery with a three-year firearm specification and improper handling of a firearm. The court imposed an aggregate indefinite sentence of six to seven and one-half years imprisonment under the Reagan Tokes Law.

{¶ 2} Smith's convictions arise from a single incident on the afternoon of April 5, 2022. On that date, Smith boarded a COTA bus at the Linden Transit Center near the intersection of 11th Avenue and Cleveland Avenue on Route 1431. The bus was being driven by Leslie Dickerson and had one other passenger. Smith got on the bus and presented Dickerson with a 31-day discount pass, but did not scan a key card, which is required by COTA to use the discount pass. Smith started down the aisle of the bus, when Dickerson

asked her for a key card. Smith stated she did not have one with her.  As a result, and in accordance with COTA's policy, Dickerson informed Smith she was required to pay the full $2 fare to ride the bus, and Smith asked him if he was kidding her.  When he responded that he was not, she immediately whirled around and pulled out a pink-colored gun, threatened to shoot Dickerson, quickly approached him, pointed the gun at his head, asked him "what the f*ck are you playing with?" and stated that she would "ride this f*cking bus." (State's Ex. A, Bus Video at 15:52 p.m. *et seq*.)

{¶ 3}   At the same time, Chloe Miller and another person attempted to board the bus, but immediately turned around and got off when they saw Smith brandishing a gun and threatening the bus driver.  Smith turned around and walked to a seat in the back of the bus, put the gun away, and continued loudly complaining and swearing. Dickerson closed the doors and began to drive the bus away.

{¶ 4}   Dickerson drove down the bus route on 11th Avenue, but repeatedly pressed his emergency call button and did not allow any other passengers to board. He did not stop the bus to protect the other passenger from Smith, but when the bus approached the 11th Avenue and High Street stop, the remaining passenger prepared to exit the bus. Dickerson then stopped the bus at the stop and allowed that passenger to exit.  He then exited the bus himself and then went into the nearby Barnes & Nobel bookstore, where he called 911.

{¶ 5}   Smith remained in her seat in the rear of the bus, occasionally exclaiming in alarm and rocking back and forth. She also appeared to have made a mobile telephone call. Within a few minutes, a COTA official approached the bus and entered—he noticed Dickerson was absent, but that Smith was still in her seat and while standing in the front bus doorway asked Smith where the driver was. She did not appear to respond, and the COTA official left the bus.  A few moments later, numerous police cruisers arrived on the scene. Sergeant Jason Ayers confronted Smith, who told Ayers that she did indeed have a gun. Ayers was able to retrieve the gun from Smith, whom he described as "unassuming" and "compliant."  (Sept. 18 & 19, 2023 Tr. Vol. 1 at 95-100.)  The gun was loaded at the time Ayers obtained it. Thereafter, multiple officers then boarded the bus and placed Smith under arrest.

{¶ 6} Several months prior to the eventual trial date, Smith expressed dissatisfaction with her counsel and requested by a letter to the court to represent herself.

The court permitted her attorney to withdraw and appointed new counsel to represent Smith. Smith subsequently wrote several letters to the court expressing dissatisfaction with her new counsel. At a hearing on March 7, 2023, the court reviewed the letters from Smith, and her counsel indicated that Smith had expressed opposition to a competency evaluation. Smith, however, then agreed to such an evaluation, stating that she was "competent to represent [herself] * * * very competent. I know exactly what's going on." (Mar. 7, 2023 Tr. at 16.)

{¶ 7}   The court ordered her to submit to a competency evaluation. On April 18, 2023, the court held a hearing on the evaluation results. After his evaluation, Netcare psychologist Paul Goldstein had concluded that "Ms. Smith has the capacity to understand the nature and objective of the proceedings but lacks the capacity to assist counsel in her own defense," and that Smith is "mentally ill." (Apr. 18, 2023 Tr. at 2.) The trial court ordered that Smith "be held for competency restoration at the Twin Valley Behavioral Health Center in the Moritz Unit * * * until such time as [she] is returned to or restored to competency." *Id.* at 7-8. Smith responded:

> THE DEFENDANT: Yes. I want to acquit this case. I'm coming for you with the Supreme Court, because everything that she write -- everything that I say, she writes. And I'm very competent. If I can tell you what an affidavit of indigency is, that means I'm low income. And low income is where the State requires me to be able to get an attorney because I'm low income, and I can understand that. I know that's your bailiff. I know that's your court reporter.
>
> THE COURT: I am --
>
> THE DEFENDANT: The prosecutor sits here. That's the lawyer. And you're the judge. Keep writing baby, because I know you're writing. I'm coming.
>
> THE COURT: Okay.

*Id.* at 8. The court held a hearing following Smith's treatment at Twin Valley a few months later and stated that it had "received a report indicating that, after evaluation, it was [the evaluator's] opinion that Ms. Smith is competent to stand trial, that she understands the nature and the objective of the proceedings against her and is able to assist counsel in her own defense." (July 10, 2023 Tr. at 2-3.) Both the state and Smith, through her counsel,

stipulated to the findings in the report, and Smith was subsequently returned from Twin Valley to the Franklin County jail.

{¶ 8}   But about a month later, Smith's attorney informed the court that Smith believed that she was "regressing somewhat" because the diet and medications at the jail did not comport with what she had received at Twin Valley:

> THE COURT: I can't do anything about the diet. You know, that's set by the jail and their staff. But we can take a look at the medications.
>
> Ms. Dixon, if you need, I can make a call over to medical at the jail and see what's going on with that.
>
> THE DEFENDANT: Yes. Can you make sure that it's the Vitamin E, my fish oil, my Wellbutrin. I was taking two other psych meds that I was taking when I first got incarcerated. However, I did fill out two medical authorization forms to get the information, but they refused to give it to me.
>
> * * *
>
> So I just want to get everything that I had, you know, when I was at Twin Valley to make me stable. And fruits and vegetables are conducive to the mental. So is fish oil. I've been mistreated. I've been left in my cell with dirty uniforms, not being able to come out --
>
> THE COURT: We'll see what we can do, Ms. Smith.
>
> THE DEFENDANT: -- for me to take a shower. They played with my commissary. They took my rights for to me to speak in court on behalf of children, which I was subpoenaed, court ordered. They won't let me do video visits. They play with everything in there at Jackson Pike.
>
> THE COURT: Okay. Thank you, Ms. Smith.

(Aug. 7, 2023 Tr. at 4-5.)

{¶ 9}   The case was scheduled for a trial on September 18, 2023, and Smith next agreed to a plea agreement to be entered that date. But after briefly talking to another one of the trial court's defendants in the moments before the plea hearing, Smith rejected the offer:

THE COURT: You're shaking your head.

 THE DEFENDANT: And I no longer want it.

THE COURT: Okay. What happened in the back with Mr. Brown?

THE DEFENDANT: Okay. We talked about that. We can just keep it at the regular. I want to take it to trial and I want them to keep it at aggravated robbery.

THE COURT: What did Mr. Brown say to you?

THE DEFENDANT: Mr. Brown?

THE COURT: The guy -- the gentleman in the back?

THE DEFENDANT: Yeah. I'm taking it to trial.

THE COURT: You changed your mind based on --

THE DEFENDANT: Yep.

THE COURT: -- what one guy said?

THE DEFENDANT: Yep.

THE COURT: Okay.

THE COURT: Don't release Mr. Brown.

THE DEFENDANT: [Makes sound].

THE COURT: All right. No. Ms. Smith, we're going to come back at 1:30. I want you to take a long hard look, because if Mr. Brown is so smart --

THE DEFENDANT: No.

THE COURT: -- why would he be in jail?

THE DEFENDANT: No. I want to go with - - I want to go with it.  I want to go with it because I don't want to do any more time. I'm innocent.

THE COURT: We're going to recess until 1:30.

MS. GORRELL: Thank you, Your Honor.

(Sept. 18 & 19, 2023 Tr.Vol. 1 at 16-17.)  The case proceeded to a trial that afternoon, and the state called three witnesses: the bus driver Leslie Dickerson, Sergeant Jason Ayers, and the would-be bus passenger Chloe Miller. The state then rested, and Smith's attorney indicated that Smith had decided to testify in her own defense.  The court accepted all of the state's exhibits into evidence without any objection, and then denied the defense's motion for acquittal of the aggravated robbery charge:

> THE COURT: I think that, when viewing the evidence on in the light most favorable to the State of Ohio, which is the standard under Rule 29, that the aggravated robbery statute says that in committing or attempting to commit a theft offense, that the person brandished, used, displayed a firearm in the commission of the offense.  And I think reasonable minds could disagree that by remaining to bus to obtain the bus' services while possessing, brandishing, displaying a firearm that she wasn't fleeing from the offense. She was committing the offense to get from Point A to Point B. And then that, I think, is the State's theory of the case. Whether it's a strong theory or a weak theory is not for the Court to say, but I think a jury could reasonably reach different conclusions about whether the State has proven that that act of staying on the bus to receive the bus' services while brandishing, using and displaying a firearm is the act of the aggravated robbery itself. And so I will deny the Rule 29 motion at this time.
>
> THE DEFENDANT: So how is it that when they first started, that they never, in the beginning --
>
> THE COURT: Ms. Smith, this is not a discussion.
>
> THE DEFENDANT: Why isn't it? It's my life.
>
> THE COURT: But this is not how court is going [to] proceed. Your attorney has indicated that you want to testify in this case. Is that how you feel? Earlier today it was indicated that you didn't want to testify. I'm happy to give you maybe five minutes to talk about it with Ms. Dixon.
>
> THE DEFENDANT: No. Proceed. However this may fall, this is already decided for God to do it the way it's going to be done. And I know I didn't rob anything. So proceed on however --
>
> MS. DIXON: You don't want to --
>
> THE DEFENDANT: Because -- no, I don't. No, I don't.

> MS. DIXON: So you're not going to testify?
>
> THE DEFENDANT: No. I don't.
>
> THE COURT: When I bring the jury out, I'm going to give Ms. Dixon the chance to call witnesses, and that will be your chance to testify. And if you decline to testify, we're not going to revisit that issue.
>
> THE DEFENDANT: We're not. And it's fine.
>
> THE COURT: Okay.

*Id.* at 119-21. When the jury returned, the defense rested without calling any witnesses. But when the court reconvened for closing arguments and jury instructions the following day, Smith again started an argument with the judge, this time because she claimed she had not seen the bus video of the incident prior to trial. (Sept. 20, 2023 Tr. Vol. 2 at 129-39.) There was another plea offer that she accepted and rejected. She accused her attorney of railroading her and lying to her. She then tried to insist on testifying again, and when the trial court denied that request, she accused all the participants of "teaming up" on her. *Id.* at 139. During this entire time, she was in a jail uniform and she insisted on completing the trial in jail clothes, even after the court warned her against it—she refused to change into civilian clothes, even though her attorney had provided them for her. She then interjected several times during the state's closing argument and rebuttal, and just prior to the judge providing oral instructions to the jury, stated that she "was told to say that Jesus Christ was coming back -- and you need to get your houses in order." *Id.* at 168. At that point, the judge ordered her removed from the courtroom. The jury deliberated for under an hour and returned guilty verdicts on both offenses. The court immediately proceeded to sentencing as follows:

> THE COURT: Ms. Smith, you have the right to make a statement at this time. Is there anything you would like to tell the court?
>
> THE DEFENDANT: Jesus Christ is coming back. Get your house in order.
>
> THE COURT: Thank you. This case does present a host of challenges for the court. I do recognize that Ms. Smith, and it's detailed in her evaluation that was done by Dr. Sahadevan with Twin Valley Behavioral Healthcare. She does have some mental

health issues and concerns. They didn't rise to the level that she was incompetent to stand trial in this case, but they have been evident in some of her thinking errors and her sometimes acting out in court.

It makes it difficult because, you know, no one should have to go through what Mr. Dickerson did. He's just doing his job driving the bus. And he's, you know, he just wants to get home and he doesn't want to have a gun shoved in his face. The evidence, in my view, was overwhelming; and I think that's reflected in the fact that it took the jury about 40 minutes to reach a verdict, give or take. It was very clear from the start.

I would note that I have observed Ms. Smith throughout this trial engaging in competent, rational decision-making when it comes to -- I've observed her talking with Ms. Dixon about plea negotiations, and [w]ell, what's expungable? Can I get something that's expungable? That's a rational thought process. And so I think to the extent that she was found competent, I think she demonstrated that in court; and I was able to observe that personally. That there is a rational thought process.

That rational thought process, though, I think is founded on an irrational premise. And when you start with an irrational premise, you're going to get irrational results. And I think had Ms. Smith been able to think rationally, she would have chosen a different course other than to go to trial.

*Id.* at 194-96. The court imposed an aggregate indefinite sentence of six to seven and one-half years imprisonment, and this appeal followed.

{¶ 10} Smith asserts three assignments of error with the trial proceedings:

**Assignment of Error No. 1:** Trial counsel was ineffective for not requesting competency or NGRI evaluations.

**Assignment of Error No. 2:** The trial court erred when it did not further inquire into Appellant's competency to stand trial.

**Assignment of Error No. 3:** The verdict on count one was supported by insufficient evidence and was against the manifest weight of the evidence.

Smith's first two assignments of error both assert insanity and competency, first within the context of ineffective assistance, and then as error by the court. For ease of review, we will address these assignments together.

{¶ 11} R.C. 2901.01(A)(14) provides that a "person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that *at the time of the commission of the offense*, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." (Emphasis added.)

{¶ 12} By contrast, R.C. 2945.37(G), which addresses a charged defendant's competency to stand trial, provides as follows:

> A defendant is presumed to be competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the *defendant is incapable of understanding the nature and object of the proceedings against the defendant or of assisting in the defendant's defense*, the court shall find the defendant incompetent to stand trial and shall enter an order authorized by section 2945.38 of the Revised Code.

(Emphasis added.) Accordingly, a primary difference between a plea of not guilty by insanity and a suggestion of incompetence to stand trial is a temporal one—the plea of insanity is focused on the defendant's mental state at the time of the alleged crime, whereas competency is focused on the defendant's ability to understand and assist at the time of trial.

{¶ 13} Regarding insanity, this court has observed:

> The affirmative defense of insanity * * * must be proven by a preponderance of the evidence. *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶ 64, 781 N.E.2d 72; R.C. 2901.05(A). The defendant must persuade the trier of fact that "at the time of the commission of the offense, the [defendant] did not know, as a result of a severe mental disease or defect, the wrongfulness of the [defendant's] acts." R.C. 2901.01(A)(14). Conversely, a defendant cannot avoid criminal responsibility if the defendant "knows his or her conduct violates the law and commonly held notions of morality." *State v. Jennings*, 10th Dist. No. 05AP-1051, 2006-Ohio-3704, ¶ 22. This means, to prove insanity, demonstrating a mental defect is not enough; the defendant must also show an inability to understand right from wrong.

*State v. Cochran*, 10th Dist. No. 23AP-258, 2024-Ohio-1997, ¶ 8. *See also State v. Humphries*, 51 Ohio St.2d 95 (1977), paragraph one of the syllabus. A defendant must persuade the trier of fact of an insanity defense's applicability by a preponderance of the evidence. *State v. Monford*, 10th Dist. No. 09AP-274, 2010-Ohio-4732, ¶ 70, citing *Jennings* at ¶ 10. And an insanity defense "does not permit individuals who know what is legally wrong to eschew the law." *Jennings* at ¶ 24.

{¶ 14} Regarding competency, in *State v. Lanier*, 10th Dist. No. 20AP-480, 2021-Ohio-4194, ¶ 7, the court has held that:

> Fundamental principles of fairness and due process demand that a criminal defendant who is not legally competent may not be tried or convicted of a crime. *See Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); *State v. Berry*, 72 Ohio St.3d 354, 359, 1995-Ohio-310, 650 N.E.2d 433 (1995). The constitutional test for competency to stand trial is whether the defendant has sufficient present ability to consult with their lawyer with a reasonable degree of rational understanding, and whether they have a rational as well as factual understanding of the proceedings against them. *Berry* at 359, citing *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). Ohio has codified this standard in R.C. 2945.37(G). An appellate court will not disturb a trial court's competency determination where it is supported by reliable and credible evidence in the record. *State v. Williams*, 23 Ohio St.3d 16, 19, 23 Ohio B. 13, 490 N.E.2d 906 (1986); *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, ¶ 33, 790 N.E.2d 303.

A defendant only needs to show by a preponderance of evidence that he is incapable of understanding the nature of the proceedings against him and assisting his counsel in his defense, and in reviewing the trial court's determination of competency, this court must determine whether the trial court's conclusion that the defendant was competent to stand trial was supported by competent, credible evidence. *E.g., State v. Hicks*, 43 Ohio St.3d 72, 79 (1989), citing *Williams* at 19.

{¶ 15} To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel "made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish that counsel's performance was deficient, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687. To establish prejudice, a defendant must show that there is a

reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A properly licensed attorney is presumed competent, and a defendant bears the burden of showing ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-56 (1988).

{¶ 16} Applying these standards to Smith's first two assignments of error, they lack merit. There is little in the record to indicate that Smith was insane under R.C. 2901.01(A)(14), in that there is no specific indication anywhere that she failed to appreciate that her action in pulling a gun on Dickerson was wrong—rather, she repeatedly claimed she was innocent of the crime and had been set up. Moreover, her actions on the bus video after pulling the gun and threatening Dickerson arguably reveal that she understood she had done wrong, in that she seemed to express anger, regret, and incredulity after taking her seat on the back of the bus, and that she was largely compliant with arresting officers when she was taken into custody. The reports presented to the court demonstrate that Smith was able to understand and demonstrate knowledge of the plea of not guilty by reason of insanity, and it seems that she disdained the idea of pursuing such a plea because she believed that she was not guilty of the offenses charged. Even though Smith presented disjointed thinking and behavior throughout the proceedings, there is no indication in the evidence that she did not know the wrongfulness of her actions when she committed them because of a severe mental disease or defect. On appeal, Smith claims that "pulling a gun on a bus driver over a two-dollar fare in and of itself is enough to warrant the inquiry" into an insanity plea. But unless there is clear evidence of insanity at the time of the offense that was overlooked by Smith's trial counsel, her appellate counsel cannot establish trial counsel performed deficiently, let alone establish prejudice for not presenting an insanity defense. Similarly, there is nothing in the record to indicate the trial court erred to Smith's prejudice by failing to sua sponte pursue insanity proceedings on her behalf. The trial court had multiple hearings and substantial direct contact with Smith and was able to review all the same evidence as the jury, as well as the competency reports prepared for its review. Smith has not presented any persuasive basis for concluding that she was insane at the time of the offense, let alone one that would justify holding the trial court violated her rights by not forcing her counsel to pursue an insanity defense.

{¶ 17} Turning to competency to stand trial, the trial court specifically concluded that Smith was competent based on her words and actions during the pendency of the case, by the fact that she had undergone competency treatment and been deemed competent by an evaluator, and by the reports it reviewed in deeming her to be competent. None of the quoted swathes of the transcript reveal a lack of competency, they reveal a lack of common sense. The trial court put it well when he said that Smith's "rational thought process * * * is founded on an irrational premise. And when you start with an irrational premise, you're going to get irrational results." (Sept. 20, 2023 Tr. Vol 2 at 196.) Smith's refusal to accept the strategies presented by her attorney does not demonstrate incompetence, rather it demonstrates her willfulness and obstinance. It is worth noting that Smith herself observed that the video shows "I pulled a gun. There's no denying that." *Id.* at 117. She just seemed to believe that she could escape liability for her actions based on certain alleged failures by the police, the state, and her trial attorneys. Those beliefs do not demonstrate incompetence—indeed, they are often the basis of acquittals.

{¶ 18} Because we conclude that the trial court did not err in finding Smith competent or not referring her for additional treatment, and because there is nothing in the record upon which a not guilty by reason of insanity plea could be based, Smith's further trial attorney was not ineffective for pressing those issues, and Smith was not prejudiced by Smith's trial counsel's decisions relating to those issues. If there is evidence supporting a claim of ineffective assistance on those points, it is not in the record, and therefore can only be presented in a petition for postconviction relief rather than in her direct appeal. For all these reasons, her first and second assignments of error are overruled.

{¶ 19} Turning to Smith's third assignment of error, pursuant to *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, in determining whether a conviction is supported by sufficient evidence of guilt, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, *following Jackson v. Virginia*, 443 U.S. 307 (1979). By contrast, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387

(1997), *superseded by constitutional amendment on other grounds*, and quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact, *see State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus, and the jury may take note of inconsistencies at trial and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 20} Here, the evidence was more than sufficient for a rational fact finder to conclude that Smith committed the crimes with which she had been charged. The trial court judge correctly denied Smith's Crim.R. 29(A) motion based on his conclusion that the state had presented sufficient evidence of theft of services, and that therefore there was sufficient evidence of aggravated robbery. We observe that Smith only pulled the gun on Dickerson after he informed her that she must pay $2 or exit the bus, and that on the video she can clearly be heard stating that she would "ride this f*cking bus." (State's Ex. A, Bus Video at 15:52 p.m. *et seq.*) This evidence is sufficient to establish that Smith stayed on the bus with purpose to use the bus service, that she knowingly obtained the bus service without the approval of the authorized driver, and that she did so based on a threat and intimidation. *See* R.C. 2913.02(A)(3) and (4). Accordingly, there is sufficient evidence she committed a theft offense, and that in committing that offense she displayed or brandished a deadly weapon. *See* R.C. 2911.01(A)(1). And there is sufficient evidence to show that Smith knowingly transported a loaded, concealed, and accessible firearm onto the bus. *See* R.C. 2923.16(B).

{¶ 21} Moreover, this is not the rare case where the defendant's convictions are against the manifest weight of the evidence presented at trial. Dickerson's testimony and the bus video establish that Smith pulled the gun, threatened Dickerson with it, and continued to ride on the bus afterward, and Sergeant Ayers' testimony established that the gun was loaded when he retrieved it from Smith. The record contains no other evidence was presented to the jury to support the conclusion Smith was wrongly found guilty of the offenses with which she was charged. For all these reasons, Smith's third assignment of error is overruled.

{¶ 22} Having overruled Smith's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and LELAND, JJ., concur.

———————